## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

AIMEE MADDONNA,

                               *Plaintiff,*

       v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

ALEX AZAR, in his official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES, DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

STEVEN WAGNER, in his official
capacity as Principal Deputy
Assistant Secretary of the
ADMINISTRATION FOR CHILDREN AND
FAMILIES;

HENRY MCMASTER, in his official
capacity as Governor of the State of
South Carolina; and

JOAN B. MEACHAM, in her official
capacity as Acting State Director of
the SOUTH CAROLINA DEPARTMENT OF
SOCIAL SERVICES,

                               *Defendants.*

C.A. No. _____

**COMPLAINT**

1

## INTRODUCTION

1.     Children in foster care are vulnerable. The parents and families who choose to care for these children during often tumultuous periods of transition provide the children with an invaluable gift: a safe and loving home. In placing children in foster homes, therefore, what should matter is the needs of the foster children and the foster families who care for them. But not in South Carolina.

2.     Here, what matters—to the U.S. Department of Health and Human Services and to the Governor of this State—is the religious preferences of faith-based foster-care child-placement agencies like Miracle Hill Ministries, which barred Aimee Maddonna and her family from opening their home and their hearts to children in foster care because the Maddonna family is Catholic, and Miracle Hill does not approve of Catholics.

3.     Miracle Hill is the largest foster-care child-placement agency in South Carolina. It receives federal and state taxpayer funds to recruit, license, and train prospective foster parents and to place children in foster care with those families. Miracle Hill refuses, however, to recruit, license, train, allow to volunteer, or place foster children with any family that does not both adhere to evangelical Christian religious beliefs and belong to evangelical Christian churches of which Miracle Hill approves. With knowledge of Miracle Hill's discriminatory policy, the United States government and the government of South Carolina have enabled, sanctioned, and continued to fund the organization's preference for one religious group above all others in the provision of governmental services, to the detriment of the children that the State contracts with those agencies to serve.

4.     Indeed, the U.S. government and the State of South Carolina have issued sweeping religious exemptions from federal and state religious-antidiscrimination requirements to allow any faith-based foster-care child-placement agency in the state to refuse to recruit, work with, train, or

place children with prospective foster parents who do not share the private child-placement agency's religious beliefs.

5.     Defendants' actions are both irrational and illegitimate: The government ostensibly protects religious freedom by expressly authorizing and funding religious discrimination.

6.     Moreover, by permitting foster-care child-placement agencies, such as Miracle Hill, to put their own religious preferences ahead of the best interests of the children when providing state and federally funded foster-care services, the U.S. government and the State of South Carolina harm vulnerable children by denying them access to loving families, while also harming those loving families, like the Maddonna family, by subjecting them to discrimination on the basis of their religious identities, in violation of the U.S. Constitution, federal law, and basic decency.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States.

8.     This Court has remedial authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under, among other things, 28 U.S.C. §§ 1343(a)(3) and 2072, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

9.     This Court has additional remedial authority with respect to the federal defendants under the Administrative Procedure Act, 5 U.S.C. §§ 551–706. Claims under the APA are ripe for judicial review because the grant by the federal defendants of an exception (i.e., exemption) under 45 C.F.R. § 75.102 from the essential religious antidiscrimination protections recognized by 45 C.F.R. § 75.300(c) constitutes "final agency action for which there is no other adequate remedy in court." *See* 5 U.S.C. § 704.

10.    This Court has additional remedial authority with respect to the state defendants under 42 U.S.C. § 1983.

11.    Venue is proper in the Greenville Division of the United States District Court for the District of South Carolina under 28 U.S.C. § 1391 and Local Rule 3:01(A)(1) because the federal defendants are subject to suit in any federal jurisdiction, a substantial part of the events giving rise to the claims occurred within this division, Plaintiff resides in this division, and no real property is involved in this action.

## PARTIES

12.    **Plaintiff Aimee Maddonna** and her husband and their three children are residents of Simpsonville, South Carolina, and observant Catholics. The Maddonnas are also federal and state taxpayers, whose tax dollars contribute to the administration of federal and South Carolina child-welfare programs, including the services offered at public expense and on a discriminatory basis through Miracle Hill.

13.    The Maddonnas suffered harms as alleged in this Complaint because Miracle Hill Ministries, an organization that contracts with South Carolina to serve as the state's agent in licensing foster parents and making placements of foster children with families, denied the Maddonnas the opportunity to foster or volunteer with foster children in the organization's care because the family does not share the organization's preferred religious beliefs.

14.    The Maddonnas also suffered harms as alleged in this Complaint because they object to paying through their federal and state tax dollars for publicly funded foster-care services that are provided not in the best interests of foster children and families but instead in a discriminatory manner that excludes Catholics, Jews, other religious minorities, and nonbelievers for not adhering to a preferred faith.

15. **Defendant United States Department of Health and Human Services** is the federal agency that is charged by Congress with the authority and duty to enhance and protect Americans' health and well-being via the provision of health programs and social services. HHS oversees the Administration for Children and Family's functions and responsibilities involving the funding and oversight of state foster-care systems.

16. **Defendant Alex M. Azar II** is sued in his official capacity as Secretary of the United States Department of Health and Human Services, where he oversees HHS and is responsible for all aspects of HHS's operations and management.

17. **Defendant Administration for Children and Families** is the sub-agency of HHS that is responsible for administering federally appropriated Title IV-E Foster Care program funding to states to provide safe foster-care placements for children who cannot remain in their homes as a result of maltreatment, lack of care, or lack of supervision. ACF is charged with ensuring that those funds are used for the care of children that comports with professional standards, including protecting the children's civil rights.

18. **Defendant Steven Wagner** is sued in his official capacity as Principal Deputy Assistant Secretary for the Administration for Children and Families. On behalf of ACF, Wagner issued a letter on January 23, 2019, granting South Carolina an exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c).

19. **Defendant Governor Henry McMaster** is sued in his official capacity as Governor of South Carolina. McMaster issued an Executive Order on March 13, 2018, permitting faith-based foster-care child-placement agencies to associate and work only with "foster parents and homes who share the same faith" as the exempted entities. S.C. Exec. Order No. 2018-12. At all times relevant to these allegations, McMaster was acting under color of state law for purposes

5

of 42 U.S.C. § 1983. Under Article IV, Section 15, of the South Carolina Constitution, the Governor is required to "take care that the laws be faithfully executed" and is thus responsible for ensuring that all South Carolina executive departments and agencies, including the Department of Social Services, comply with governing federal and state laws and regulations.

20.    **Defendant Joan B. Meacham** is sued in her official capacity as Acting State Director of the South Carolina Department of Social Services. Meacham oversees the South Carolina Department of Social Services and its programs, reporting directly to Governor McMaster. The South Carolina Department of Social Services is the state agency responsible for overseeing the South Carolina Foster Care Program, licensing and supervising private foster-care child-placement agencies, and administering federal Title IV-E Foster Care and Adoption Assistance program funds to those private agencies. At all times relevant to these allegations, Meacham was acting under color of state law for purposes of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

*Plaintiff Aimee Maddonna's Interactions with Miracle Hill Ministries as a Prospective Mentor and Foster Parent*

21.    Aimee Maddonna's father was raised in foster care and orphanages, and he often told his children that he felt like the foster-care system had failed him. When he came of age, therefore, it became important to him to take in foster children, to provide them with the type of foster family that he wished he had.

22.    Thus, Mrs. Maddonna grew up alongside biologically related and foster siblings. Some foster children stayed with her family for only a few days; others were with them for many years. In all, dozens of foster children became a part of Mrs. Maddonna's family.

23.    Mrs. Maddonna's parents instilled in their children the importance of providing a safe, loving home to children in need of a foster family.

24.     Mrs. Maddonna intends to pass these fundamental values of charity and service to her own three children, whom she homeschools in a loving home that she and her husband have made for them. In furtherance of that aim, Mrs. Maddonna has sought out volunteer activities that her family can perform together near their home.

25.     Accordingly, building on her experience growing up with foster siblings, Mrs. Maddonna contacted Miracle Hill Ministries to see whether her family could volunteer to work with foster children. Mrs. Maddonna hoped that her family would bond with the children with whom they volunteered, and the family would be willing and prepared to provide a foster home to a needy child who was an appropriate fit with the family. Mrs. Maddonna's particular interest is and has been in helping older children, who are less likely than younger children to receive the attention of prospective foster and adoptive families.

26.     Miracle Hill Ministries is a foster-care child-placement agency based in Greenville, South Carolina, that provides, among other services, assistance to those interested in being licensed by the South Carolina Department of Social Services as foster parents in the South Carolina Region 1 counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens, and Spartanburg.

27.     As a licensed child-placement agency, Miracle Hill assists prospective foster parents and families in obtaining state foster-care licenses, provides home studies and assessments that the South Carolina Department of Social Services relies on in making foster-care licensing decisions, and determines the foster families with whom the children in foster care should be placed.

28.     Miracle Hill is one of only three nongovernmental foster-care child-placement agencies working with foster parents in Greenville County, where Mrs. Maddonna resides, and it is the largest nontherapeutic foster program in the State of South Carolina.

29.     Additionally, unlike the Department of Social Services, Miracle Hill permits children as well as adults to volunteer with children and teenagers awaiting placement in a foster home, allowing for families like the Maddonnas to volunteer *as a family*.

30.     Miracle Hill also helps prospective foster parents assess the fit of a child with a particular home and family when a potential placement arises.

31.     For Mrs. Maddonna, having her whole family volunteer with the foster children was and is an important first step to developing relationships with and getting to know children who might be good matches for foster placement in her home.

32.     Volunteering helps families establish the types of relationships with children in foster care that lead to long-term foster placements or even adoption.

33.     Additionally, because the Maddonna children have special needs, it is important to Mrs. Maddonna to ensure that any foster child that the family would welcome into their home would be a good fit with this special family.

34.     Mrs. Maddonna learned about Miracle Hill's volunteer opportunities when a representative of the organization advertised to a homeschooling parents' group with which Mrs. Maddonna participates.

35.     Mrs. Maddonna contacted a Miracle Hill representative and corresponded with her over the course of a few weeks about the opportunity to volunteer with foster children.

36.     During this period, Mrs. Maddonna told her children about the exciting opportunities that they could have to provide love and care to children in foster care. Her family

made plans to take the foster children out for ice cream, to teach them to play guitar, and to buy them new clothes for the first day of school.

37.     After Mrs. Maddonna provided answers about her experience with the foster-care system and her family's ability to volunteer, the Miracle Hill representative said that there was just one final question before Mrs. Maddonna could start volunteering: Could she provide Miracle Hill with the name of her church as a reference? Mrs. Maddonna, a Catholic, responded that she would be happy to provide the name of her parish.

38.     Mrs. Maddonna was shocked then to learn that this reference would not be accepted, and that her family's volunteering was no longer welcome.

39.     The representative with whom she had corresponded for weeks expressed disappointment because, but for the Maddonnas' Catholic faith, they would be a great fit with the program.

40.     Later, the Director of Development for Miracle Hill informed Mrs. Maddonna that only Christians who attended the right type of Protestant church were permitted to volunteer and work with the children that the South Carolina Department of Social Services had placed in the organization's care.

41.     Mrs. Maddonna clearly understood that she and her family were ineligible to be trained by or receive placements from Miracle Hill because they are Catholic.

42.     Because of the religious requirements that Miracle Hill inserts into its provision of foster-care services, the Maddonnas were prevented from becoming a foster family or even volunteering to work with foster children.

43. Mrs. Maddonna was forced to tell her young children that, because they are Catholic, they would not be permitted to take foster children out for ice cream, teach them to play guitar, or buy them new clothes for the first day of school.

44. The Maddonnas are not alone in this experience: Miracle Hill has turned away both Jews and Catholics seeking to volunteer with the foster children in the organization's care. *See* Lydia Currie, *I Was Barred from Becoming a Foster Parent Because I Am Jewish*, Jewish Telegraphic Agency (Feb. 5, 2019), https://www.jta.org/2019/02/05/opinion/i-was-barred-from-becoming-a-foster-parent-because-i-am-jewish.

45. Defendants not only were aware of, but also affirmatively enabled, discrimination against the Maddonnas by licensing and funding Miracle Hill.

46. Since at least the spring of 2017, the South Carolina Department of Social Services has been aware that Miracle Hill discriminates against potential foster and adoptive parents and families on the basis of the religion of those parents and families.

47. In communications with the federal Administration for Children and Families in February 2018, Governor McMaster or his agents have explicitly informed the Administration that Miracle Hill and other South Carolina faith-based foster-care child-placement agencies have the desire to select among prospective foster parents on the basis of religion, contrary to federal and state requirements.

48. Because of the discrimination that she faced at Miracle Hill, Mrs. Maddonna has been afraid to reach out to the other nongovernmental foster-care child-placement agencies, all of which she believes are faith-based. She does not want to get her family's hopes up again, only to be told once more that their kind is not welcome to volunteer with or provide a loving home to children in South Carolina's foster-care system.

10

49.    Mrs. Maddonna again reached out to Miracle Hill on February 9, 2019, asking that her family be accepted as volunteers.

*South Carolina and Federal Foster-Care Program Requirements*

50.    Approximately 4,500 children are currently in South Carolina's foster-care system. *See* S.C. DEP'T OF SOC. SERVS., *Total Children in Foster Care on June 30, 2018–Office of Case Management*, https://dss.sc.gov/media/1828/total-children-in-foster-care-on-june-30-2018.pdf.

51.    To provide care for these children, the South Carolina Department of Social Services contracts with private child-placement agencies—organizations that receive licenses from the state to facilitate the placement of foster children with foster parents and families by providing counseling, referrals, searches, and other services, and that receive reimbursements for those services from state and federal funds. *See* S.C. Code § 63-9-30(5); S.C. Code Regs. § 114-4910.

52.    Typically, DSS issues a standard, one-year license to child-placement agencies that meet all regulations and qualify to participate in the program. *See* S.C. Code § 114-4930(E).

53.    DSS then monitors all foster-care child-placement agencies in the state to ensure that they comply with federal and state laws and requirements. *See* S.C. Code § 114-4920(E).

54.    If a child-placement agency is temporarily unable to comply with a state foster-care licensing regulation, the Department may grant the agency a temporary license if the agency provides a written plan to the Department to correct its areas of noncompliance within a probationary period. *See* S.C. Code § 114-4930(F).

55.    DSS may deny or revoke a child-placement agency's license if DSS determines that the agency cannot comply with state regulations or if the agency provides false information during the application or relicensing process. *See* S.C. Code §§ 114-4930(G)(1)(d)–(e).

56.     Licensed child-placement agencies conduct a variety of services on behalf of the state.

57.     Licensed child-placement agencies conduct initial and relicensing foster-home investigations using the regulations established by DSS and make recommendations that DSS uses to determine whether a foster-family license should be issued, denied, reissued, or revoked. *See* S.C. Code §§ 114-550(C), (D), (K), 114-4980(A)(2)–(3).

58.      Licensed child-placement agencies license foster homes on behalf of the state and then monitor those homes for compliance with the foster-home regulations established by DSS; investigate any complaints about possible violations of foster-home regulations; and provide DSS with written reports of their findings, conclusions, and any anticipated actions affecting the investigated homes' licenses. *See* S.C. Code §§ 114-4980(A)(4)–(5).

59.     In addition to controlling foster parents' interactions with the South Carolina Foster Care System, child-placement agencies exercise substantial control over foster children's time in the system, developing written case plans for all children assigned to them and determining which foster home is appropriate for a child's placement based on the agency's assessments of foster families' and children's needs and strengths. *See* S.C. Code §§ 114-4980(B)–(C).

60.     Under Title IV-E of the Social Security Act, South Carolina obtains reimbursement for a portion of the state's foster-care expenditures from the U.S. Department of Health and Human Services and uses those federal funds to reimburse licensed child-placement agencies for the services that they provide.

61.     In order to receive these funds, South Carolina must ensure that its licensed child-placement agencies comply with federal law and requirements.

62.     Since December 18, 2015, all HHS solicitations and contracts have been required to include the following clause:

> It is the policy of the Department of Health and Human Services that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as race, color, national origin, religion, sex, gender identity, sexual orientation, or disability (physical or mental). By acceptance of this contract, the contractor agrees to comply with this policy in supporting the program and in performing the services called for under this contract. The contractor shall include this clause in all sub-contracts awarded under this contract for supporting or performing the specified program and services. Accordingly, the contractor shall ensure that each of its employees, and any sub-contractor staff, is made aware of, understands, and complies with this policy.

48 C.F.R. § 352.237-74.

63.     On July 13, 2016, HHS proposed changes to 45 C.F.R. § 75.300 to codify for all HHS grants what was already required for all HHS contracts: a prohibition against discrimination in the provision of federally funded services on the basis of a list of "non-merit factors," including religion. *See* 45 C.F.R. § 75.300(c); 81 Fed. Reg. 45,270-01.

64.     HHS also proposed, through notice-and-comment rulemaking, to codify the Supreme Court's decisions in *United States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), by requiring that all same-sex spouses, marriages, and households are treated the same as different-sex spouses, marriages, and households in terms of determining beneficiary eligibility and participation in activities related to HHS grants. *See* 45 C.F.R. § 75.300(d); 81 Fed. Reg. at 45,271.

65.     The proposal proved noncontroversial: HHS received only twelve comments on the codification, all of which were supportive of the proposed regulation. *See* 81 Fed. Reg. 89,393-01 (Dec. 12, 2016).

66.     The proposed changes to 45 C.F.R. § 75.300 became effective January 11, 2017.

67. Under 45 C.F.R. § 75.101(b)(1), the antidiscrimination provisions of 45 C.F.R. § 75.300 follow federal grant dollars through grantees, such as South Carolina, to subgrantees, including Miracle Hill, thus barring discrimination in the provision of vital services in state foster-care programs.

68. Religiously affiliated organizations are permitted under federal and South Carolina law to become licensed child-placement agencies and to receive federal and state funds for providing foster-care services, as long as they comply with all applicable laws—just as nonreligious organizations must. *See* 45 C.F.R. § 87.3.

*A South Carolina Faith-Based Foster-Care Child-Placement Agency's Noncompliance with Federal and State Antidiscrimination Laws*

69. While reviewing Miracle Hill Ministries' application to renew its child-placement-agency license for 2018, the South Carolina Department of Social Services discovered references on the organization's website to its recruitment of Christian foster parents and families only.

70. Additionally, DSS discovered that Miracle Hill's foster-care application requests information regarding foster parents' and families' religious beliefs and practices, including requiring a reference from the parent or family's pastor.

71. Further, DSS discovered that Miracle Hill's Foster Care Manual directs its staff to inquire about families' particular religious beliefs and practices before accepting them to volunteer or to foster a child.

72. Accordingly, DSS followed up with Miracle Hill to determine whether the organization uses the religious information to assess homes for appropriateness of foster-care placements or to determine whether Miracle Hill would serve a prospective foster parent or family at all.

73.     In subsequent telephone conversations, DSS confirmed that Miracle Hill uses the religious information that it gathers to refuse to provide services as a licensed child-placement agency to families who are not practicing evangelical Christians.

74.     Specifically, Miracle Hill has required and continues to require every prospective foster parent to:

a.     "be a born-again believer in the Lord Jesus Christ as expressed by a personal testimony and Christian conduct";

b.     "be in agreement without reservation with the doctrinal statement of Miracle Hill Ministries";[1]

c.     "be an active participant in, and in good standing with, a Protestant church";

d.     "have a genuine concern for the spiritual welfare of children entrusted to their care"; and

---

[1] Miracle Hill Ministries' Doctrinal Statement reads:

We believe the Bible to be the only inspired, infallible, inerrant and authoritative Word of God. We believe that there is one God, creator of heaven and earth, eternally existent in three distinct persons: Father, Son, and Holy Spirit. We believe in the deity and humanity of Jesus Christ, that He was born of a virgin, that we are redeemed by His atoning death through His shed blood, that He bodily resurrected and ascended into Heaven, and that He will come again in power and great glory to judge the living and the dead. We believe in the value and dignity of all people: created in God's image, but alienated from God and each other because of our sin and guilt, and justly subject to God's wrath. We believe that regeneration by the Holy Spirit by grace through faith is essential for the salvation of lost and sinful people. We believe in the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ. We believe that the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body, the church.

Miracle Hill Ministries, Doctrinal Statement, https://miraclehill.org/who-we-are/doctrinal-statements/.

e. "have a lifestyle that is free of sexual sin (to include pornographic materials, homosexuality, and extramarital relationships)."

75.     DSS determined that Miracle Hill's policies and practices constitute discrimination on the basis of religion and contravene the following regulations and policies:

a.     S.C. Code of Regulations § 114-4980(A)(2), which sets forth fully the requirements for foster-home investigations and does not permit child-placement agencies to create any additional requirements—such as religious requirements—for the families that they serve;

b.     45 C.F.R. § 87.3(d), which entitles and encourages religious organizations to participate in HHS programs, such as foster-care programs, but prohibits religious discrimination by participating organizations in the provision of services;

c.     45 C.F.R. § 75.300(c), which prohibits discrimination on the basis of religion; and

d.     DSS Human Services Policy and Procedure Manual § 710, which commits DSS and its programs to providing "equal opportunities to all families and children, without regard to their . . . religion . . . ."

76.     Additionally, DSS determined that Miracle Hill was violating its own policies submitted to DSS as part of the organization's license-renewal process.

77.     Specifically, Miracle Hill's Foster Care Manual section MHM.CPA.900, labeled "Introduction," states: "In accordance with Federal and State laws and South Carolina Department of Social Services (SCDSS) policy, this agency and contracted providers for foster care and adoption services are prohibited from discriminating on the basis of race, color, national origin, sex, age, religion, political beliefs or disability."

16

78.     Yet DSS's investigation revealed, as already noted, that Miracle Hill does in fact discriminate on the basis of religion.

79.     For these reasons, on January 26, 2018, DSS determined that it was appropriate to issue Miracle Hill a temporary (rather than regular) child-placement-agency license under South Carolina Code of Regulations § 114-4930(F) while DSS worked with Miracle Hill to resolve the legal violations and to ensure that Miracle Hill complies with the policies submitted to DSS in the licensing process.

80.     DSS requested that Miracle Hill address the concerns identified and issue a written plan of compliance within thirty days.

81.     On knowledge and belief, Miracle Hill has never issued a written plan of compliance.

*Efforts to Provide Religious Exemptions from Federal and State Religious-Antidiscrimination Laws for All South Carolina Faith-Based Foster-Care Child-Placement Agencies*

82.     Rather than require Miracle Hill to comply with federal and state law, South Carolina's Governor, Henry McMaster, ordered the creation of exemptions from state antidiscrimination requirements and sought the same with respect to federal antidiscrimination requirements for all South Carolina faith-based foster-care child-placement agencies.

83.     *First*, on February 27, 2018, Defendant Governor McMaster wrote a letter to Defendant Steven Wagner, then-Acting Assistant Secretary for the Administration for Children and Families in the U.S. Department of Health and Human Services, requesting that HHS provide to the State of South Carolina a waiver for faith-based entities from the HHS requirement that federal-grant funds be withheld or returned in case of violations of federal law by state foster-care child-placement agencies.

84.     McMaster's letter specifically identified two federal regulations, 45 C.F.R. §§ 75.300(c) and (d), that he believed "effectively requir[ed faith-based foster-care child-placement agencies] to abandon their religious beliefs or forgo the available public licensure and funding."

85.     As discussed above, 45 C.F.R. §§ 75.300(c) and (d) merely codify long-standing antidiscrimination policy of HHS that had been included in all HHS contracts since 2015 and reflect Supreme Court precedent.

86.     45 C.F.R. § 75.300(c) provides that:

> no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

87.     45 C.F.R. § 75.300(d) provides: "In accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples."

88.     McMaster's letter requested that HHS permit South Carolina's faith-based child-placement agencies to discriminate, in violation of 45 C.F.R. §§ 75.300(c) and (d), while operating and conducting governmental services funded under Title IV-E of the Social Security Act.

89.     *Second*, on March 13, 2018, McMaster issued South Carolina Executive Order No. 2018-12, directing DSS to permit faith-based foster-care child-placement subgrantees to associate only with "foster parents and homes who share the same faith" as the subgrantee "in recruiting, training, and retaining foster parents."

90.     McMaster's Order also states that DSS "shall not deny licensure to faith-based [foster-care child-placement agencies]" and directs DSS to "review and revise its policies and

18

manuals in accordance with this Order and ensure that [DSS] does not directly or indirectly penalize religious identity or activity in applying" the state's requirements for licensure for foster care.

91.    Further, on June 29, 2018, the South Carolina legislature ratified a budget proviso directing DSS to use funds appropriated by the legislature to make and promulgate rules and regulations to protect faith-based foster-care child-placement agencies from adverse actions if those agencies "decline to provide any service that conflicts with, or provide any service under circumstances that conflict with, a sincerely-held religious belief or moral conviction of the" agency. *See* 2018 S.C. Acts 361, § 38.30.

92.    As a result of McMaster's February 2018 letter to Defendant Wagner and subsequent communications among Defendants or their agents, on January 23, 2019, HHS granted the South Carolina Foster Care Program an exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c).

93.    In his letter granting the exemption, Wagner stated that South Carolina Foster Care Program subgrantees would be permitted to use "religious criteria in selecting among prospective foster care parents," including criteria based on the religious identity and practices of prospective foster-care parents.

*The Effect of Sanctioning South Carolina Faith-Based Foster-Care Child-Placement Agencies' Discriminatory Policies*

94.    By permitting only those who attend preferred churches or practice a preferred faith to volunteer with and provide homes to South Carolina's children and teenagers in the foster-care system, faith-based foster-care child-placement agencies are, with express authorization, approval, and funding from the United States and South Carolina, denying these children access to safe and loving homes.

95.     These organizations are authorized by both the federal and state Defendants to create religious requirements in addition—or directly contrary—to federal and state requirements concerning who may provide homes to children in foster care, thus excluding many otherwise eligible prospective foster parents who are willing to open their homes to children in need.

96.     Miracle Hill's barring of non-evangelicals from volunteering with children in its foster-care program is detrimental to the children's finding homes, as are other, similar requirements by other faith-based agencies.

97.     Volunteering and mentoring with foster children allow individuals to *see* these children, who would otherwise simply be faces on a billboard or in an infomercial.

98.     Individuals and families who volunteer with and mentor foster children are more likely to open their homes to the children, providing them with the stable environments and individualized care that they, and all children, desperately need.

99.     The religious exemptions from federal and state religious antidiscrimination requirements that Defendants have granted permit South Carolina's faith-based foster-care child-placement agencies effectively to bar those who do not share the agencies' religious beliefs from volunteering with and providing safe and loving homes to children in the South Carolina Foster Care Program.

100.    It is never acceptable to use state or federal funds to discriminate based on religion.

101.    What is more, the timing of the religious exemptions at issue here is particularly concerning given the spike in foster-care caseloads in South Carolina caused by the opioid epidemic.

102.    From 2013 to 2018, the number of children in foster care in South Carolina steadily rose from 3,306 children to 4,518.

103.    Over that same five-year period, the percentage of foster-care-home placements has remained relatively flat, with the total number of foster-care-home placements in 2018 being only 3,017—leaving a shortfall of some 1,500 homes.

104.    The South Carolina region with the most children in foster care is Region 1, which has approximately one-third (1,555 of 4,518) of the children statewide.

105.    Miracle Hills Ministries is a faith-based foster-care child-placement agency in Region 1 and is the largest placement agency in the region and the state.

106.    Miracle Hill refuses to recruit or train prospective foster parents or families who do not share the organization's religious beliefs and will not place foster children with, or allow volunteers from, families who are not evangelical Christians.

107.    In granting religious exemptions to South Carolina's faith-based foster-care child-placement agencies, Defendants did not consider the effects of those agencies' discriminatory policies on the number of foster homes available to the growing number of children in the South Carolina Foster Care System.

108.    Although South Carolina Executive Order No. 2018-12 notes that all foster-care child-placement agencies "must assist *any children in foster care* without regard to their religious beliefs," the religious exemptions were granted without regard to the effects of faith-based foster-care child-placement agencies' discriminatory policies on children in foster care or on the children's biological parents, who may not share the religious beliefs of the faith-based foster-care child-placement agency to which the state assigns a particular child.

109.    South Carolina law requires that religious education be provided to children in foster care "in accordance with the expressed wishes of the child's natural parents . . . ." *See* S.C. Code Regs. 114-550(H)(11).

110.    Therefore, in spite of the exemptions, faith-based foster-care child-placement agencies still should assist Catholic children, for example, and must provide Catholic children with religious education in the Catholic faith if requested by a child's biological parents.

111.    But under the exemptions provided, faith-based foster-care child-placement agencies can effectively terminate biological parents' rights to direct their children's religious upbringing while those children are in the care of the child-placement agency or a foster family, by preventing the child from being placed with a family that shares the child's biological family's religious beliefs.

112.    And faith-based foster-care child-placement agencies' religious tests or requirements of the sort that Miracle Hill employs ensure that children's beliefs that differ from those of the agency to whom a child is assigned by the state will *not* be respected because the foster families are vetted to ensure a particular type of religious instruction to the foster children.

113.    Nor have Defendants considered how faith-based foster-care child-placement agencies' discriminatory recruitment, training, and placement policies will affect lesbian, gay, bisexual, transgender, and questioning youth, who are over-represented in foster-care systems throughout the United States and whose very identities are at odds with the religious doctrinal statement to which Miracle Hill, for example, requires prospective foster families and volunteers to attest.

114.    Indeed, the religious exemptions do not consider or serve the best interest of children in foster care at all.

115.    Allowing faith-based foster-care child-placement agencies to close the door to willing and fully qualified foster parents like Aimee Maddonna because of their religious beliefs not only opens the door to, and expressly licenses, taxpayer-funded discrimination, but it also

deprives vulnerable children of safe, affirming, and loving homes, thus only worsening South Carolina's foster-care crisis.

## CLAIMS FOR RELIEF

### Count I—Federal Defendants
### (Administrative Procedure Act—Arbitrary, Capricious, Abuse of Discretion, and Not in Accordance with Law)
### 5 U.S.C. § 706(2)(A)

116.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

117.    The exemption from 45 C.F.R. § 75.300(c) granted by the federal defendants to the South Carolina Foster Care Program under 45 C.F.R. § 75.102(b) constitutes final agency action under the Administrative Procedures Act.

118.    The exemption is arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A) and must therefore be set aside because:

a.    HHS failed to follow the procedure for granting exemptions under 45 C.F.R. § 75.102(b) by granting an unlawful class-wide exemption rather than deciding whether to grant exemptions for "individual non-Federal entities on a case-by-case basis";

b.    HHS failed to consider relevant factors such as harm to prospective foster parents and families, the best interests of foster children, and possible alternatives to the exemption;

c.    the exemption is not warranted by HHS's stated reasons in Defendant Wagner's January 2019 letter; and

d.    the exemption purports to permit conduct that conflicts with other existing federal laws without providing clear guidance on whether those laws still apply or reasons for providing exemptions from those laws.

## Count II—Federal Defendants
### (Administrative Procedure Act—Contrary to Constitutional Rights)
### 5 U.S.C. § 706(2)(B)

119.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

120.    The exemption from 45 C.F.R. § 75.300(c) granted by the federal defendants to the South Carolina Foster Care Program under 45 C.F.R. § 75.102(b) is contrary to constitutional rights, powers, privileges, or immunities and therefore violates 5 U.S.C. § 706(2)(B) in the following regards and must therefore be set aside:

a.    The exemption violates the Establishment Clause of the First Amendment to the U.S. Constitution.

b.    The exemption violates the equal-protection guarantee of the Fifth Amendment to the U.S. Constitution because it has both the purpose and effect of discriminating impermissibly on the basis of religion.

c.    The exemption discriminates against the Maddonnas based on their exercise of a fundamental right, in violation of the substantive-due-process protections of the Fifth Amendment.

## Count III—All Defendants
### (First Amendment—Establishment Clause)
### U.S. Const. amend. I

121.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

122.    Defendants have provided and continue to provide federal and state taxpayer funds to faith-based foster-care child-placement agencies that discriminate based on religion in recruiting and training foster parents and volunteers and in determining foster-care placements for children who cannot remain in their homes.

123.    Defendants were and are on notice that faith-based foster-care child-placement agencies that received federal and state taxpayer funds, including Miracle Hill, provide services in a discriminatory manner based on religion.

124.    Defendants have enabled, sanctioned, and ratified, and have failed to implement adequate safeguards against, faith-based foster-care child-placement agencies' use of federal and state taxpayer funds for their own religious purposes, including the agencies' categorical exclusion based on religion of certain members of the public from publicly funded foster-care programs.

125.    The federal defendants have also enabled, sanctioned, and ratified, and have failed to implement adequate safeguards against, faith-based foster-care child-placement agencies' use of federal taxpayer funds for their own religious purposes by granting a blanket religious exemption to all subgrantees in the South Carolina Foster Care Program to allow them to violate the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c).

126.    Defendant McMaster has enabled, sanctioned, and ratified, and has failed to implement adequate safeguards against, faith-based foster-care child-placement agencies' use of taxpayer funds for their own religious purposes by issuing South Carolina Executive Order No. 2018-12, which directs the South Carolina Department of Social Services to permit faith-based foster-care child-placement subgrantees to associate "in recruiting, training, and retaining foster parents" with only those "foster parents and homes who share the same faith" as the subgrantees.

127.    Defendant Meacham and the South Carolina Department of Social Services have enabled, sanctioned, and ratified, and have failed to implement adequate safeguards against, faith-based foster-care child-placement agencies' use of taxpayer funds for their own religious purposes by implementing South Carolina Executive Order No. 2018-12 and 2018 S.C. Acts 361, § 38.29,

and by permitting faith-based foster-care child-placement subgrantees to recruit, train, and place children with only foster parents and families who share the agencies' preferred faith.

128.    By enabling, sanctioning, and ratifying, as well as failing to implement adequate safeguards against, faith-based foster-care child-placement agencies' use of taxpayer funds for their own religious purposes, Defendants have violated the Establishment Clause of the First Amendment because, among other reasons, Defendants' actions, policies, practices, and procedures:

        a.    have the primary purpose of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

        b.    have the primary effect of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

        c.    have the purpose and effect of preferring the religious beliefs of some people and institutions over the religious beliefs and fundamental rights of others;

        d.    endorse the religious beliefs of faith-based foster-care child-placement agencies;

        e.    delegate governmental authority to faith-based foster-care child-placement agencies, permitting these agencies to create religious requirements for gaining access to governmental programs, services, and resources;

        f.    entangle government with religion;

        g.    coerce individuals, including vulnerable and impressionable children who are wards of the state placed in the care of faith-based foster-care child-placement agencies, to believe and practice the agencies' preferred faiths without regard to the children's or their biological parents' own faiths; and

h.    make the Maddonnas, other prospective foster families, children in foster care, those children's biological parents, and other third parties bear the costs and harms of faith-based foster-care child-placement agencies' religious beliefs or religious practices.

129.    By granting to all subgrantees in the South Carolina Foster Care Program a blanket religious exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) without showing that the requirement imposes substantial government-imposed burdens on religious exercise for the individual subgrantees receiving the exemption or providing adequate safeguards to ensure that only substantially burdened subgrantees may avail themselves of the religious exemption, the federal defendants have violated the Establishment Clause of the First Amendment.

130.    By granting a religious exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) for Miracle Hill and other subgrantees in the South Carolina Foster Care Program to use religious criteria in selecting among prospective foster-care parents, when compliance with the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) would not cause a substantial government-imposed burden on these entities' religious exercise, the federal defendants have violated the Establishment Clause of the First Amendment.

131.    Defendants have harmed and violated the Establishment Clause rights of the Maddonnas by using their federal and state tax dollars to underwrite, favor, and endorse religious beliefs to which the Maddonnas do not subscribe and religious denominations to which they do not belong.

132.    Defendants' actions also harm other individuals and families who wish to become foster parents or otherwise to work with children in foster care but do not share the religious beliefs

of the faith-based foster-care child-placement agencies that participate in and administer portions of South Carolina's foster-care program.

133.    Through the actions described above, Defendants have deprived and continue to deprive Mrs. Maddonna and her family of their rights protected by the Establishment Clause of the First Amendment to the United States Constitution.

### Count IV—Federal Defendants
### (Fifth Amendment—Equal Protection)
### U.S. Const. amend. V

134.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

135.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying equal protection of the laws.

136.    The federal defendants have discriminated and continue to discriminate impermissibly against individuals and families, including the Maddonnas, based on religion by funding the administration of services that they are on notice are being administered in a manner that disfavors certain religious identities and their adherents.

137.    By denying to individuals and families, including the Maddonnas, participation in taxpayer-funded federal programs based solely on their religion, the federal defendants have deprived and continue to deprive these individuals and families of the equal dignity, liberty, and autonomy guaranteed by the Fifth Amendment and brand them as inferior by discriminating against them based on their religious beliefs and identities.

138.    The federal defendants' actions impermissibly subject non-evangelicals, including Catholics such as the Maddonnas, to different and unfavorable treatment based on religion.

139.    Discrimination based on religion—a suspect classification—is presumptively unconstitutional and subject to strict scrutiny.

28

140.    There is no constitutionally adequate justification for the federal defendants' actions.

141.    The federal defendants' actions fail to advance any legitimate governmental interest, much less an important or compelling one. On the contrary, the government-supported religious test at issue is antithetical to the government's responsibility to ensure that the best interests of the children in foster-care programs determine the children's placement with foster parents.

142.    Through the actions described above, the federal defendants have deprived and continue to deprive Mrs. Maddonna and her family of their rights protected by the equal-protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

### Count V—Federal Defendants
### (Fifth Amendment—Substantive Due Process)
### U.S. Const. amend. V

143.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

144.    The Fifth Amendment's Due Process Clause protects individuals' substantive rights to be free to exercise the religion of their choosing without unjustified governmental intrusion.

145.    The federal defendants have enabled, sanctioned, and ratified the use of religious tests to deny the Maddonnas the ability to volunteer or foster in conjunction with South Carolina's federally funded foster-care program based solely on religious criteria. In doing so, the federal defendants have violated and continue to violate the substantive-due-process component of the Fifth Amendment because the federal defendants have burdened Mrs. Maddonna's and her family's liberty interests and penalized their exercise of their fundamental rights to exercise their religion.

146.   There is no constitutionally adequate justification for the federal defendants' infringement of Mrs. Maddonna's and her family's fundamental rights. On the contrary, the federal defendants' actions harm not only the Maddonnas and other non-evangelical individuals and couples who wish to become foster or adoptive parents, but also the children in state care awaiting and hoping for placement in stable and loving homes.

147.   Through the actions described above, the federal defendants have violated and continue to violate the substantive-due-process protections of the Fifth Amendment to the United States Constitution.

### Count VI—South Carolina Defendants
### (Fourteenth Amendment—Equal Protection)
### U.S. Const. amend. XIV

148.   Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

149.   The Equal Protection Clause of the Fourteenth Amendment prohibits states and state officials from denying equal protection of the laws.

150.   Violations of the equal-protection guarantee by persons acting under color of state law are subject to redress under 42 U.S.C. § 1983.

151.   The South Carolina defendants have impermissibly discriminated and continue to discriminate based on religion against individuals and families, including the Maddonnas, by funding the administration of services that the state defendants are on notice are being administered in a manner that disfavors certain religious identities and adherents.

152.   The state defendants have deprived and continue to deprive individuals and families, including the Maddonnas, of equal dignity, liberty, and autonomy, and have branded them as inferior, by discriminating against them based on their religious beliefs and identities.

153. The state defendants' actions impermissibly subject non-evangelicals, including Catholics such as the Maddonnas, to different and unfavorable treatment based on religion.

154. Discrimination based on religion—a suspect classification—is presumptively unconstitutional and subject to strict scrutiny.

155. There is no constitutionally adequate justification for the state defendants' actions.

156. The state defendants' actions fail to advance any legitimate governmental interest, much less an important or compelling one. On the contrary, the government-supported religious test at issue is antithetical to the state defendants' responsibility to ensure that the best interests of the children in the South Carolina Foster Care Program determine the children's placement with foster parents.

157. Through the actions described above, the state defendants have deprived and continue to deprive Mrs. Maddonna and her family of their rights protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count VII—South Carolina Defendants
## (Fourteenth Amendment—Substantive Due Process)
## U.S. Const. amend. XIV

158. Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

159. The Fourteenth Amendment's Due Process Clause protects individuals' substantive rights to be free to exercise the religion of their choosing without unjustified governmental intrusion.

160. Violations of the substantive-due-process guarantee by persons acting under color of state law are subject to redress under 42 U.S.C. § 1983.

161.    The state defendants have enabled, sanctioned, and ratified the use of religious tests to deny the Maddonnas the ability to apply to volunteer or foster in conjunction with South Carolina's federal- and state-funded foster-care program based solely on religious criteria.

162.    In doing so, the state defendants have violated and continue to violate the substantive-due-process component of the Fourteenth Amendment because they have burdened Mrs. Maddonna's and her family's liberty interests and penalized their exercise of their fundamental rights to exercise their religion.

163.    There is no constitutionally adequate justification for the state defendants' infringement of Mrs. Maddonna's and her family's fundamental rights.

164.    The state defendants' actions harm religious individuals and couples, including the Maddonnas, who wish to become foster or adoptive parents.

165.    Through the actions described above, the state defendants have violated and continue to violate the substantive-due-process protections of the Fourteenth Amendment to the United States Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aimee Maddonna respectfully requests that the Court:

a.    declare that the exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) granted by the federal defendants to the South Carolina Foster Care Program on January 23, 2019, was issued in violation of, and violates, the Administrative Procedure Act and the First and Fifth Amendments to the U.S. Constitution;

b.    declare that South Carolina Executive Order No. 2018-12 was issued in violation of, and violates, the First and Fourteenth Amendments to the U.S. Constitution;

c.    declare that the federal defendants have violated and continue to violate the First and Fifth Amendments to the U.S. Constitution by providing federal tax dollars to faith-

based foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services;

        d.      declare that the state defendants have violated and continue to violate the First and Fourteenth Amendments to the U.S. Constitution by providing taxpayer funds to faith-based foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services;

        e.      enter a permanent injunction prohibiting all Defendants from implementing, enforcing, or relying on the exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) granted by the federal defendant to the South Carolina Foster Care Program on January 23, 2019, or any provision thereof;

        f.      enter a permanent injunction prohibiting the state defendants from implementing, enforcing, or relying on South Carolina Executive Order No. 2018-12;

        g.      enjoin all Defendants from expending or providing tax dollars to faith-based foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services; and

        h.      award such further and additional relief as the Court deems just and proper, including reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, the Equal Access to Justice Act, any other applicable statutes, or the Court's inherent powers.

Respectfully submitted this 15th day of February, 2019.

s/    *Aaron J. Kozloski*

Aaron J. Kozloski (D. S.C. Bar No. 9510)
CAPITOL COUNSEL, L.L.C.
P.O. Box 1996
Lexington, SC 29071-1996
Tel: (803) 465-1400
Fax: (888) 513-6021
*aaron@capitolcounsel.us*

Richard B. Katskee*
Kenneth D. Upton, Jr. **
Alison Tanner*
AMERICANS UNITED FOR SEPARATION OF CHURCH
    AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234
Fax: (202) 466-3353
*katskee@au.org*
*upton@au.org*
*tanner@au.org*

*Counsel for Plaintiff Aimee Maddonna*

*    *Pro hac vice* application forthcoming.

**  Licensed in Oklahoma and Texas only.
    Supervised by Richard B. Katskee, a
    member of the D.C. Bar. *Pro hac vice*
    application forthcoming.