**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Aimee Maddonna, | ) | |
| | ) | Civil Action No. 6:19-cv-00448-TMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT HENRY MCMASTER'S** |
| United States Department of Health and | ) | **MEMORANDUM IN SUPPORT OF** |
| Human Services, et al., | ) | **THE MOTION TO DISMISS** |
| | ) | |
| Defendants. | ) | |

Defendant Henry McMaster ("Governor McMaster"), in his official capacity as Governor of South Carolina, files this Memorandum in support of his Motion to Dismiss pursuant to Federal Rules of Civil Procedure Rule 12(b)(1) and (6) because Plaintiff lacks standing to assert the claims she is attempting to assert and because she has failed to alleged facts sufficient to constitute a cause of action upon which relief could be granted.

## INTRODUCTION

The factual scenario underlying Plaintiff's complaint is not new, unusual, or unique to South Carolina. For hundreds of years, in South Carolina and across the nation, state and federal governments have partnered with faith-based providers of social services whose care for the needy is compelled by, and is itself an exercise of, their religious faith. And for hundreds of years, these partnerships have been widely and rightly acknowledged to be constitutionally permissible.

Last year, however, a federal regulation threatened to prevent many faith-based organizations from continuing their long-standing efforts to help children in need. Governor McMaster responded by requesting a waiver from the federal agency responsible for the regulation and by directing South Carolina agencies to refrain from discriminating against faith-based organizations solely on the basis of their religious beliefs. For this, Plaintiff charges him with three constitutional violations. All three should be dismissed for the reasons summarized briefly here and explained in more detail below:

- Plaintiff's claims fail because she lacks standing. Plaintiff has alleged no cognizable injury; the injury she alleges is not fairly traceable to Governor McMaster's actions; and the relief she requests will not redress the injury she alleges. Plaintiff also lacks

taxpayer standing (a doctrine that does not apply to her Due Process and Equal Protection claims) to assert her Establishment Clause claim because Governor McMaster's challenged acts are discretionary executive actions, rather than legislative appropriations.

- Even if Plaintiff had standing to assert her claims, her substantive Due Process claim should be dismissed because (i) she fails to allege any executive conduct violating any substantive Due Process right, (ii) more than that, she fails to identify a fundamental right or plausibly allege interference with the rights she asserts, and (iii) Governor McMaster's actions are rationally related to legitimate government interests.

- Plaintiff's Equal Protection claim should be dismissed because (i) Governor McMaster's actions did not discriminate on the basis of religion, (ii) any alleged discriminatory conduct by a private foster care agency cannot be attributed to him, and (iii) his actions are rationally related to legitimate government interests.

- Plaintiff's Establishment Clause claim should be dismissed because the Supreme Court and lower courts have repeatedly upheld the constitutionality of government accommodation of and contracting with religious entities. Even under the three-part test established by *Lemon v. Kurtzman*, Governor McMaster's actions are permissible because (i) they serve the secular purposes of maximizing opportunities for foster child placement and avoiding violation of private agencies' rights, (ii) they do not have the primary purpose of advancing religion, as they merely remove a burden on religious exercise, and (iii) they do not entangle government with religion, but rather effectuate a cleaner separation between them.

## I.    STATEMENT OF THE FACTS.[1]

### A.    Foster care in South Carolina.

The South Carolina Department of Social Services ("DSS"), which is tasked with caring for South Carolina children in its foster care system, oversees the training, licensing, and supervision of foster homes and residential foster facilities in the state. Consistent with longstanding historical practice, DSS contracts with Child Placing Agencies ("CPAs")—private entities that recruit, train, and supervise foster homes and assist in the placement of children into

---

[1] The facts set out herein are drawn the same facts alleged by Plaintiff—they are drawn from the allegations of the Complaint and the documents relied on and incorporated by reference therein. *See generally Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion to dismiss into one for summary judgment). They are appropriate background to provide context for the legal arguments that follow, and the Court's resolution of the Motion to Dismiss need not rely on any facts outside those sources or determine the veracity of the facts alleged therein.

those homes, *see generally* S.C. Code Ann. Regs. 114-4910 to -4980—and reimburses them for their services. DSS issues qualifying CPAs a standard one-year license or a temporary license that allows a CPA to continue to operate while working to correct any noncompliance with regulation, *see id.* 114-4930(E)–(F), and DSS may deny or revoke licenses for violations of the licensing statute or licensing regulations, *see id.* 114-4930(G)(1)(b), (d).

Licensed CPAs perform a number of valuable services: they monitor foster homes, recommend revocations of foster home licenses, select foster homes for child placement, and develop and supervise the implementation of case plans for children placed in foster homes. *See id.* 114-4980(A)–(D). A number of CPAs with whom DSS contracts are private religious entities that gladly serve children of every race, color, national origin, creed, disability, sex, age, political belief, sexual orientation, and gender identity. Many faith-based CPAs see their charitable work as a religious ministry, and they view the upbringing of children and care of orphans as religious duties. *See* Stephen B. Presser, *The Historical Background of the American Law of Adoption*, 11 J. FAM. L. 443, 480 (1972) (noting the "intense religious devotion" and "zeal," "which seems to have motivated many of the men and women who were active in the reforms made for the care of dependent children"). Accordingly, while they serve children of every background and situation, many faith-based CPAs believe they should only take volunteers, hire employees, and recruit, train, and supervise foster homes that share their religious mission and beliefs. DSS has allowed faith-based CPAs the freedom to protect the integrity of their ministries by making employment and associational choices based on their beliefs.

One such CPA is Miracle Hill Ministries ("Miracle Hill"). Miracle Hill is a faith-based organization that serves the homeless, hungry, and needy in upstate South Carolina. Besides serving the homeless in nine shelters and providing recovery centers for those seeking to overcome

addictions, Miracle Hill helps hundreds of foster children by supporting over 200 families licensed as foster homes by DSS. For 80 years, Miracle Hill has gladly served anyone in need, regardless of race, color, ethnicity, national origin, age, sex, disability, religion, sexual orientation, or identity.

### B.    Recent regulatory events.

Because South Carolina receives reimbursements for its foster-care expenditures from the U.S. Department of Health and Human Services ("HHS"), the state was forced to reassess its practices with regard to faith-based CPAs after HHS issued new regulations in the waning days of the Obama administration. Specifically, in January 2017, HHS amended regulations implementing Title IV-E of the Social Security Act to require that states receiving Title IV-E funds ensure they are expended in a way that does not discriminate on the basis of religion. The amendment added an entirely new subsection to the regulation governing recipients of title IV-E funds:

> It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion . . . . Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

45 C.F.R. § 75.300(c). This new regulation purported to apply both to DSS (as a recipient of title IV-E funds) and to CPAs (as sub-recipients of Title IV-E funds). *See* 45 C.F.R. §§ 75.101(b)(1), 1355.30(i). Thus, when the time came for faith-based CPAs, such as Miracle Hill, to renew their licenses for 2018, DSS determined it would only issue temporary licenses. (*See* Compl. [ECF No. 1] ¶¶ 69–80.)

In response, on February 27, 2018, Governor McMaster, in his official capacity, wrote to HHS seeking a deviation or waiver from the new regulation. (*See* Letter from Governor McMaster to Steven Wagner, HHS Acting Assistant Secretary (Feb. 27, 2018), attached hereto as **Exhibit**

A.)[2] His request was motivated at least in part by the fact that the new regulation would require HHS to recoup funds from DSS if HHS determined DSS's contracts with faith-based CPAs violated the new regulations. (*See id*.) Governor McMaster further explained that "faith-based CPAs are essential as our State needs more CPAs to recruit more families" for foster care, and that religious providers have been serving in that role "for years." (*Id.* at 1.) The new regulations adopted by HHS, the Governor noted, "effectively require CPAs to abandon their religious beliefs or forego the available public licensure and funding," which violates the CPAs' constitutional rights as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb to 2000bb-4. (*Id.* at 2.) Governor McMaster also directed HHS's attention to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), which had been decided by the Supreme Court after HHS amended its regulations, and which "made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." (*Id.*) A deviation, Governor McMaster explained, would protect the rights of faith-based CPAs and, more importantly, would maximize the number of available foster homes, as faith-based CPAs are some of the largest providers of foster families. (*See id.* ("South Carolina needs to continue growing our CPAs, not prevent them from serving our State's children.").)

Shortly after seeking a deviation from HHS, Governor McMaster issued Executive Order No. 2018-12. The Order affirmed the well-founded principle that "faith-based organizations may retain their religious character and participate in government programs," a right protected by the First Amendment to the U.S. Constitution, by the analogous provision of the South Carolina Constitution, and by the South Carolina Religious Freedom Act of 1999, S.C. Code Ann. §§ 1-32-

---

[2] In deciding this motion, the court may consider the letter for appropriate purposes because it is referenced in, and integral to, the complaint, (*see* Compl. ¶¶ 47, 82–88), and its authenticity is not disputed, *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–68 (4th Cir. 2016).

10 to -60. (*See* Exec. Order No. 2018-12 (Mar. 13, 2018), at 1, attached hereto as **Exhibit B**). The Order also acknowledges the historical fact that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing constitutionally permissible practice" and that faith-based CPAs "fulfill[] a crucial need for the State and provid[e] a critical service to the children of South Carolina." (*Id.* at 2.) Mindful that "DSS licenses many CPAs and provides a variety of CPA options from which foster parents may choose," the Order recognizes that "faith-based CPAs should not be asked to compromise sincerely held religious beliefs in recruiting, training, and retaining foster parents" and should be able to freely "associate [with] foster parents and homes who share the same faith." (*Id.*) In short, "religious observers and organizations should not be required to sacrifice the tenets of their faith to serve the children of South Carolina," especially when doing so would only decrease the availability of desperately needed foster homes. (*Id.*) Accordingly, the Order directs DSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "review and revise its policies and manuals" to "ensure that DSS does not directly or indirectly penalize religious identity or activity" in issuing licenses. (*Id.* at 3.)

Subsequently, in June 2018, and separate from Executive Order No. 2018-12, the South Carolina legislature ratified a budget proviso directing DSS to use appropriated funds to promulgate rules and regulations for licensing CPAs that "must not discriminate . . . against a faith-based [CPA] . . . on the basis, wholly or partly, that a faith-based [CPA] has declined or will decline to provide any service that conflicts with, or provide any service under circumstances that conflict with, a sincerely-held religious belief or moral conviction of the faith-based [CPA]." 2018 S.C. Acts 1905, 2265, § 38.29.

On January 23, 2019, HHS responded to Governor McMaster's request for a deviation from 45 C.F.R. § 75.300(c). (*See* Letter from Steven Wagner, Principal Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs., to Henry McMaster, Governor, S.C. (Jan. 23, 2019), attached as **Exhibit C**.)[3] The response noted Governor McMaster's concerns about the decrease in available foster homes that would result if HHS enforced the new regulation against faith-based CPAs as well as his concerns that enforcement would unlawfully force faith-based CPAs to either abandon their religious beliefs or forego licensure. (*See id.* at 1–2.) HHS understood that faith-based CPAs, such as Miracle Hill, faced imminent revocation of their licenses unless they agreed to abandon their religious beliefs, which, as HHS recognized, CPAs such as Miracle Hill plainly would refuse to do. (*See id.* at 2.) After reviewing this information, HHS determined that requiring subgrantees who use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable under RFRA." (*Id.* at 3.) Accordingly, HHS granted the deviation Governor McMaster requested. (*See id.* at 4.)

### C.    Allegations in the Complaint.

The allegations in Plaintiff's complaint illustrate the necessity of the deviation Governor McMaster requested and the Order he issued affirming faith-based CPAs' right to make associational decisions based on their religious beliefs. As Plaintiff alleges, South Carolina desperately needs foster homes to serve the growing number of children in its foster-care system. (*See* Compl. ¶¶ 50, 102–04.) Miracle Hill, one of the largest CPAs in the state, performs vital foster-home recruitment as well as other foster-care services, including training and supporting

---

[3] The court may consider the letter for appropriate purposes because it is referenced in, and integral to, the complaint, (*see* Compl. ¶¶ 47, 92–93, 117–20, 129–30), and its authenticity is not disputed, *see Goines*, 822 F.3d at 165–68.

foster parents and supervising DSS' case plans. (*See id.* ¶¶ 3, 26, 27, 30, 105.) Without Miracle Hill, the state's foster-care services would be strained even further than they already are.

Miracle Hill gladly serves any adult or child in need, regardless of his or her race, color, ethnicity, national origin, age, sex, disability, religion, lack of religion, orientation, or identity, and Miracle Hill gladly works with volunteers without regard to such factors. *See* Miracle Hill Foster FAQ, *available at* https://miraclehill.org/wp-content/uploads/2018/11/FtF-Miracle-Hill-Foster-Care -FAQ.pdf (last visited March 14, 2019). As part of its religious faith and practice, however, Miracle Hill believes that those it places in positions of spiritual influence—including foster parents and mentors—must share its religious beliefs, mission, and motivation. *Id.*; (Compl. ¶¶ 3, 40, 96, 106).

Miracle Hill makes no secret of its strongly and sincerely held religious beliefs, including its conviction that those whom it places in positions of spiritual influence and formation should share the same beliefs. It acknowledges these beliefs on its website; it explains them in its application forms and foster-care manual; its officers and employees politely and respectfully discusses them with prospective foster parents; and its leaders emphasizes them in staff training. (*See id.* ¶¶ 69–71, 73–74.)

Plaintiff acknowledges she does not share all of Miracle Hill's religious beliefs. (*See id.* ¶¶ 37–39, 41.) Plaintiff alleges she contacted and corresponded with a Miracle Hill representative, answering questions about her past experiences with the foster-care system and her family's ability to volunteer. (*See id.* ¶¶ 35–37.) As it has done consistently in similar circumstances, (*see id.* ¶ 44), when Miracle Hill learned that Plaintiff did not share its deeply-held religious beliefs, the ministry politely informed Plaintiff that, because if its religious convictions, it could not partner with her in her desire to mentor foster children, (*see id.* ¶¶ 37–41).

Although Plaintiff was aware of other opportunities to volunteer with or foster through other CPAs in her area or with DSS directly,[4] she admits she has made no attempt whatsoever to do so. (*See id.* ¶¶ 28, 48.) Instead, less than a week before filing her complaint, Plaintiff alleges she again reached out to Miracle Hill asking to be accepted as a volunteer, (*see id.* ¶ 49), despite a professed fear of rejection that allegedly had prevented her from approaching other CPAs in her area, (*see id.* ¶ 48). Apparently without waiting for a response from Miracle Hill,[5] Plaintiff filed suit against federal and state officials and agencies.

Plaintiff asserts three claims against Governor McMaster, alleging that the actions he has taken to maximize foster-care opportunities for South Carolina's disadvantaged children and to protect the free-exercise and associational rights of South Carolina's faith-based CPAs prevented her from volunteering with and obtaining licensure through the only CPA she deigned to approach, which, she claims, violates the Establishment Clause, the Equal Protection Clause, and the Due Process Clause. (*See id.* ¶¶ 121–33, 148–65.)

## II.    ARGUMENT.

### A.    Plaintiff lacks standing.

"Standing implicates the court's subject-matter jurisdiction and may be challenged in a motion to dismiss under Rule 12(b)(1) . . . ." *Heindel v. Andino*, No. 3:18-cv-01887-JMC, ___ F. Supp. 3d ___, 2019 WL 498388, at *6 (D.S.C., Feb. 8, 2019). When ruling on a motion to dismiss

---

[4] Plaintiff alleges that Miracle Hill is one of only three nongovernmental foster care CPAs in Greenville County. (*See* Compl. ¶ 28.) It appears she is mistaken about the number of options available to her. *See Agencies Near Me*, Care2Foster, https://www.care2foster.org/agencies-near-me/ (last visited Mar. 14, 2019) (providing the names and web addresses of nine other private foster care agencies in Greenville County). But even assuming—as the court must in ruling on the Rule 12(b)(6) portion of the instant motion—that her allegations are correct, she still had at least two other private options, plus DSS, of which she admittedly never availed herself.

[5] The complaint makes no mention of Miracle Hill's decision with respect to Plaintiff's apparently informal, first-time request to volunteer, presumably because the four business days Plaintiff gave Miracle Hill before filing her complaint was simply not sufficient time.

for lack of standing, the court must accept the material allegations in the complaint and construe them in the plaintiff's favor, *see Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019), but the court may consider evidence outside the pleadings without converting the motion to one for summary judgment, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

"In order to satisfy the standing requirements of Article III of the Constitution, a plaintiff must demonstrate that: (1) [she] has suffered an injury in fact; (2) the asserted injury in fact is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely rather than just conjectural that the asserted injury in fact will be redressed by a decision in the plaintiff's favor." *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)). "The party invoking federal jurisdiction has the burden of establishing all three elements of standing." *Smith v. Catamaran Health Sols., LLC*, 205 F. Supp. 3d 699, 705 (D.S.C. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Here, Plaintiff has failed to carry her burden, and the claims against Governor McMaster must be dismissed.

       1.    *Plaintiff has not alleged a cognizable injury.*

The injury-in-fact required for standing purposes must consist of "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent" as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. The interest that Plaintiff alleges has been invaded is her ability to volunteer with and foster through a specific, private CPA. However, there is no constitutionally protected right to become a foster parent or mentor by means of volunteering with a CPA of one's own choosing. *See Smith v. Org. of the Foster Families for Equality & Reform*, 431 U.S. 816, 844–47 (1977); *Rivera v. Marcus*, 696 F.2d 1016, 1020 & n.8 (2d Cir. 1982); *Ross v. Cecil Cty. Dep't of Social Servs.*, 878 F. Supp. 2d 606, 619 (D. Md. 2012). There is also no

constitutional right for a volunteer to force a faith-based entity to associate with her merely because the entity is licensed by the state to perform foster-care services. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) ("'Freedom of association plainly presupposes a freedom not to associate.'") (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)). In the absence of a legally protected interest, Plaintiff cannot show an injury sufficient for standing, and her claims should be dismissed on this basis.

Beyond failing to allege an injury to a legally protected interest, Plaintiff also has simply failed to allege that the putative injury actually occurred. Although she claims in part to have been injured by being unable to obtain foster home licensing, Plaintiff's complaint contains no allegation that she ever applied for a license from a CPA, let alone that she was denied one. Similarly, although Plaintiff alleges she applied to volunteer with Miracle Hill shortly before filing suit, her complaint never alleges that Miracle Hill denied her application. Ultimately, neither Plaintiff nor Governor McMaster can speak for Miracle Hill, and, because Plaintiff chose not to seek a decision from Miracle Hill or to name Miracle Hill as a defendant, it remains entirely speculative whether the denial Plaintiff complains of will actually occur. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972) (concluding plaintiff lacked standing to challenge discriminatory membership policy of private organization when he never applied for membership); *S. Blasting Servs., Inc. v. Wilkes Cty.*, 288 F.3d 584, 595 (4th Cir. 2002) (holding plaintiffs lacked standing to challenge statutory delegation of permit-granting authority to third-party official when "plaintiffs have never even applied for a permit, much less been denied one"). Because the very occurrence of the alleged injuries remains speculative, Plaintiff's claims based upon these injuries must be dismissed.[6]

---

[6] In her complaint, Plaintiff appears to seek redress for injuries that she speculates are incurred by

2.    *Plaintiff's alleged injuries are not fairly traceable to Governor McMaster.*

Plaintiff has also failed to allege injuries that are fairly traceable to Governor McMaster because she does not account for "a fundamental tenet of standing doctrine: where a third party such as a private [organization] makes the independent decision that causes an injury, that injury is not fairly traceable to the government." *Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)). Indeed, "when the 'asserted injury arises from the government's allegedly unlawful . . . lack of regulation[] of *someone else*,' satisfying standing requirements will be 'substantially more difficult . . . because 'the existence of . . . the essential elements of standing depends on the *unfettered choices made by independent actors not before the courts* and whose exercise of broad and legitimate  discretion the courts cannot presume either to control or to predict.'" *Frank Krasner Enters. Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234–35 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562).

Courts have consistently "denied standing because the actions of an independent third party, who was not a party to the lawsuit, stood between the plaintiff and the challenged actions." *Id.* at 235. Thus, where an executive order allows a private third-party actor to make a donation

---

foster children, (*see* Compl. ¶¶ 1, 6, 14, 23, 94, 96–99, 101–07, 112, 114–15), natural parents of children in foster care, (*see id.* ¶¶ 108–11), and "lesbian, gay, bisexual, transgender, and questioning youth" (*id.* ¶ 113). To the extent Plaintiff seeks relief for alleged injuries to these groups, she first must show that she "[her]self is among the injured" group. *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)); *see Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties."). Here, Plaintiff has not alleged she is among the groups suffering these alleged injuries (and, in fact, the complaint strongly suggests she is not (*see* Compl. ¶¶ 12, 21–25)), and thus she has no standing to bring claims on these groups' behalf based on these alleged injuries.

and safeguards the independence of that action by removing financial incentives for the actor to decide either in favor of or against donation, injuries arising from the donation are not traceable to the executive order because "the connection between injury and policy is a 'purely speculative' one." *Doe v. Obama*, 631 F.3d at 162. Similarly, where a private third-party entity with discriminatory enrollment policies is alleged to have wrongfully received tax-exemption benefits, injuries arising from the discriminatory policies are not traceable to the government's conferral of benefits, in part because "it is entirely speculative . . . whether withdrawal of the [benefits] . . . would lead the [private entity] to change its policies." *Allen*, 468 U.S. at 758.

Here, the independent actions of Miracle Hill stand between Plaintiff and the actions of Governor McMaster that she attempts to challenge. In both seeking an HHS deviation and issuing Executive Order No. 2018-12, Governor McMaster ensured that faith-based CPAs such as Miracle Hill would have unfettered discretion to choose the employees, volunteers, and foster parents they would associate with. Indeed, unlike Plaintiff's proposed remedy, which would force faith-based CPAs to abandon their sincerely-held beliefs, Governor McMaster's policies impose no incentive one way or the other on Miracle Hill's decision whether to accept Plaintiff as a volunteer. Because these policies safeguard the independence of Miracle Hill's decisions, Plaintiff's alleged injuries arising from those decisions are not fairly traceable to the policies. *See Doe v. Obama*, 631 F.3d at 162. Further, because it is speculative, at best, whether the reversal of Governor McMaster's policies that Plaintiff challenges would lead Miracle Hill to associate with those, like Plaintiff, who do not share its beliefs, alleged injuries arising from Miracle Hill's associational practices cannot be fairly traced to Governor McMaster's policies for purposes of standing analysis. *See Allen*, 468 U.S. at 758.

Besides arising from a third-party's independent actions, Plaintiff's alleged injuries also cannot satisfy the causation requirement because they are self-inflicted. *See McInnes v. Lord Balt. Emp. Ret. Income Account Plan*, 823 F. Supp. 360, 363 (D. Md. 2011) (finding lack of standing where alleged injury "would be the result of Plaintiff's own conduct"). Neither Governor McMaster nor Miracle Hill, as a third-party CPA, has prevented Plaintiff from volunteering with or fostering through other CPAs or DSS itself. In fact, Plaintiff remains free to volunteer with or foster through many other CPAs in South Carolina.  Despite being aware of opportunities to volunteer and foster through other CPAs, Plaintiff instead decided to contact Miracle Hill alone. Thus, Plaintiff's alleged injuries—the inability to volunteer with foster children and provide foster care—are the result of her own refusal to take advantage of the opportunities to do so through other available CPAs or DSS. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013) ("Because the harm that forms the basis for [the plaintiff's claims] arises from her inability to access [certain] property, and because the statute allows for third parties to grant her permission to enter these properties, she cannot demonstrate traceability . . . .").

Because Plaintiff's alleged injuries result from Miracle Hill's as well as her own conduct, they are not fairly traceable to Governor McMaster, and for this reason her claims against him should be dismissed.

### 3.    *Plaintiff's alleged injuries would not be redressed by the relief she seeks.*

"The redressability requirement ensures that the plaintiff would personally benefit in a tangible way from the court's intervention." *Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*, 248 F. Supp. 3d 733, 747 (D.S.C. 2017) (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000)). Thus, to meet this requirement, "the plaintiff must demonstrate that it is 'likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). The requirement of "a non-speculative likelihood that the injury would be redressed by a favorable judicial decision" means that where a court "c[an] not be sure" that the relief sought would remedy the alleged injury, the plaintiff lacks standing. *Krasner*, 401 F.3d at 234. As with other standing requirements, when the alleged injury arises from the government's decision not to regulate the independent choices of a third party, redressability is "substantially more difficult to establish," as "it becomes the burden of the plaintiff to adduce facts showing that [the third party's] choices . . . will be made in such manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

Here, Plaintiff asks the court to declare that Executive Order No. 2018-12 and the budget proviso are unconstitutional, to enjoin Governor McMaster from implementing the Order or the HHS deviation, and to enjoin him from providing state resources to faith-based CPAs unless they forsake any deeply-held religious belief that they should not associate with those who do not share their beliefs. (*See* Compl., Prayer for Relief.) However, none of the relief Plaintiff requests is certain to cure the injuries she alleges. Plaintiff assumes that faith-based CPA's, in response, would comply (rather than discontinuing their foster care ministry to avoid compromising their religious identity and beliefs). This assumption, however, is mere speculation. Thus, Plaintiff has failed to carry her burden to show a non-speculative likelihood that her inability to volunteer with or foster through Miracle Hill would be redressed by the relief she seeks. For this reason, her claims against Governor McMaster must be dismissed.

### 4.   *Plaintiff lacks taxpayer standing to bring her Establishment Clause claim.*

Courts have consistently held that the interest of a taxpayer in seeing that government funds are spent in accordance with law "does not give rise to the kind of redressable 'personal injury'

required for Article III standing" because "this type of interest is too generalized and attenuated"

from the "interest[] of the public at large." *Hein v. Freedom from Religion Found.*, 551 U.S. 587,

599–600 (2007) (citing *Frothingham v. Mellon*, 262 U.S. 447 (1923)).  In *Flast v. Cohen*, 392 U.S.

83 (1968), the Supreme Court "carved out a narrow exception to the general constitutional

prohibition against taxpayer standing" in the context of alleged Establishment Clause violations.

*Id.* at 600.[7] Under this "narrowly circumscribed" exception,[8] taxpayer standing is not permitted for

"challenges that do not involve specific legislative appropriations under the taxing and spending

power." *Ansley*, 861 F.3d at 519. Specifically, expenditures that result from executive discretion—

such as through an executive order—do not provide a basis for taxpayer standing. *See Hein*, 551

---

[7] The Supreme Court has only ever applied taxpayer standing to Establishment Clause claims, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347 (2006) (citing *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988), and the Fourth Circuit has emphasized the reasons why the exception is unavailable outside that context, *see Ansley v. Warren*, 861 F.3d 512, 518–19 (4th Cir. 2017). To the extent Plaintiff asserts taxpayer standing to bring her Due Process Clause and Equal Protection Clause claims against Governor McMaster, she may not do so. *See Cuno*, 547 U.S. at 345–46 (no taxpayer standing for Due Process Clause claims) (citing *Frothingham*, 262 U.S. at 488); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 298 n.2 (3d Cir. 2003) (no taxpayer standing for Equal Protection Clause claims); *Ansley v. Warren*, No. 1:16-cv-00054-MOC-DLH, 2016 WL 5213937, at *16 (W.D.N.C. Sept. 20, 2016) ("[T]axpayer standing is simply not an appropriate means for Plaintiffs to bring their Due Process and Equal Protection claims before the court.").

Thus, because Plaintiff lacks standing for these two claims under the general standing analysis, the court should dismiss them without any need to assess Plaintiff's ability to bring them under taxpayer standing analysis. *See Cuno*, 547 U.S. at 352  ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Allen*, 468 U.S. at 752 ("Typically, . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

[8] The Supreme Court has gone out of its way to emphasize that *Flast* represents the "outer boundary" of permissible taxpayer standing, and, because "the *Flast* exception has largely been confined to its facts," it "only 'slightly lowered' the bar" on standing and "must be applied with rigor." *Hein*, 551 U.S. at 609–10 (citation and internal quotation marks omitted). Further, developments in the Court's First Amendment and Article III standing jurisprudence have left *Flast* an anomalous and unsupported aberration that, if given the chance, the Court should overrule.

U.S. at 602–03; *see also Bilbro v. Haley*, 299 F. Supp. 3d 397, 421 (D.S.C. 2017) ("[T]he narrow exception in *Flast* does not extend to executive orders . . . .").

Here, Plaintiff asserts taxpayer standing (*see* Compl. ¶¶ 14, 131), but, with respect to Governor McMaster, her complaint primarily challenges his requesting a deviation from HHS regulations and issuing Executive Order No. 2018-12. The deviation request cannot give rise to taxpayer standing because Plaintiff points to no specific legislative appropriation enacted to expressly fund the request, and any funds expended on making the request appear to result from Governor McMaster's executive discretion. *See Hein*, 551 U.S. at 602–03; *Ansley*, 861 F.3d at 519. Likewise, Executive Order No. 2018-12 is an executive order, the quintessential vehicle for implementing executive discretion, and, because Plaintiff has not alleged any specific legislative appropriation underlying it, the Order does not provide a basis for taxpayer standing. *See Hein*, 551 U.S. at 602–03; *Bilbro*, 299 F. Supp. 3d at 421.

Although Plaintiff's complaint mentions a legislative appropriation—the budget proviso[9]—in passing (*see* Compl. ¶¶ 91, 127), the proviso does not provide a basis for taxpayer standing for at least two reasons. *First*, the proviso appropriated funds only for the purpose of making and promulgating DSS rules; it did not appropriate any funds that would be paid to any CPA, faith-based or not. *See* 2018 S.C. Acts 1905, 2265, § 38.29. Reliance on such an appropriation for taxpayer standing would go beyond the exception's outer boundaries established by *Flast*. Unlike the appropriation at issue in *Flast*, the proviso here does not earmark any funds for CPAs; instead, the proviso simply directs the promulgation of rules and regulations—a legislative prerogative Plaintiff does not challenge—leaving to executive discretion which CPAs

---

[9] Although the complaint refers to Plaintiff's status as a *federal* taxpayer, it nowhere identifies a specific federal appropriation that would support federal taxpayer standing.

meet the standards for receiving funds generally appropriated for DSS's foster-care program. *See Hein*, 551 U.S. at 604 ("The expenditures challenged in *Flast* . . . were funded by a specific congressional appropriation and were disbursed to . . . religiously affiliated schools[] pursuant to a direct and unambiguous congressional mandate."); *see also Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 139 (2011) ("*Flast* . . . understood the injury alleged in Establishment Clause challenges to federal spending to be the very extraction and spending of tax money in aid of religion alleged by a plaintiff.") (citation and internal quotation marks omitted).

*Second*, even assuming Plaintiff could otherwise achieve taxpayer standing to challenge the budget proviso, she lacks any standing to challenge Executive Order No. 2018-12, which provides an independent basis to promulgate the same rules and regulations required by the budget proviso. *See* Exec. Order No. 2018-12, at 3. The Supreme Court has rejected taxpayer standing when the expenditure at issue emanates from the discretionary action of executive officials even if legislation simultaneously contemplates and authorizes the same action. *See Hein*, 551 U.S. at 605 & n.5 (discussing *Valley Forge Christian Coll. v. Ams. United for the Separation of Church & State, Inc.*, 454 U.S. 464 (1982)). Here, the decision to promulgate the rules and regulations resulted from executive discretion, namely Executive Order No. 2018-12, and any decisions to pay tax dollars to faith-based CPAs that abide by a deeply-held religious conviction not to associate with those who do not share their beliefs results from executive discretion as well. The fact that the proviso simultaneously directs such promulgation and contemplates such payments does nothing to diminish the fact that these actions are the result of executive discretion and thus cannot form the basis for taxpayer standing.

In sum, Plaintiff lacks standing to bring her claims against Governor McMaster because she has not met her burden to allege an injury in fact that is fairly traceable to Governor McMaster

and redressable by a favorable decision, and her attempt to rescue her claims by asserting taxpayer standing is a non-starter.

**B.    Plaintiff fails to state a claim for a Due Process Clause violation.**

Even assuming Plaintiff could demonstrate standing, each of her claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim for which the court could grant relief. A Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). When considering a Rule 12(b)(6) motion, the court should accept as true only the complaint's well-pleaded allegations and then should view them in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiff alleges Governor McMaster's actions violated her substantive due process rights under the Fourteenth Amendment. (*See* Compl. ¶¶ 158–65.) As a threshold matter, "[w]here executive action is concerned, a violation of an individual's substantive due process rights exists only when the official action is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Kerr v. Marshal Univ. Bd. of Governors*, 824 F.3d 62, 80 (4th Cir. 2016) (quoting *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc)); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). If that threshold is met, then "inquiry must turn to the nature of the asserted interest, hence to the level of protection to which it is entitled," which requires a plaintiff to identify a fundamental right and to plausibly allege the official interfered

with it in a way that was not narrowly tailored to meet a compelling government interest. *Hawkins*, 195 F.3d at 738, 742, 747 n.9; *see also Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182–83 (10th Cir. 2009) (applying both shocks-the-conscience test and traditional two-part substantive due process framework to executive action).[10] If the asserted right "is determined not to be 'fundamental,' it is entitled only to the protection of rational-basis judicial review." *Hawkins*, 195 F.3d at 739.

Plaintiff's complaint fails to state a substantive due process claim that satisfies any of these requirements. First, Plaintiff does not allege that any of Governor McMaster's challenged actions were so egregious or outrageous as to shock the conscience, and nothing on the face of the complaint would permit the inference that they were. *See also* Section II.D.4, *infra* (explaining that Governor McMaster's actions were not only permissible but were a constitutionally- and statutorily-required religious accommodation). Second, even if the threshold culpability test had been met, Plaintiff has failed to identify a fundamental right that has been infringed by a challenged action. To the extent her claim rests on her alleged right to volunteer with a specific private CPA (out of many available CPAs), that is not a recognized fundamental right. *See Smith*, 431 U.S. at 844–47 (1977); *Rivera*, 696 F.2d at 1020 & n.8; *Ross*, 878 F. Supp. 2d at 619. To the extent her claim rests on her right to freely exercise her religion, that is not a fundamental right she may assert in a substantive due process claim. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of

---

[10] The interrelationship between the tests for assessing an alleged substantive due process violation in the respective contexts of executive action and legislative regulation "has been a source of considerable confusion." *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005). *Hawkins* represents the Fourth Circuit's attempt to clarify its understanding of those tests.

substantive due process, must be the guide for analyzing these claims.'" (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))); *Hardy v. Unknown Agee*, No. 14-2230, 20105 WL 13782958, at *3 (6th Cir. May 8, 2015) (applying rule to free-exercise claim). Third, even if she had identified a fundamental right, Plaintiff has failed plausibly to allege that Governor McMaster's actions interfered with it. As explained above, Plaintiff has not alleged anyone (much less Governor McMaster) has prevented her from volunteering with or fostering through the numerous other CPAs in her immediate vicinity or through DSS directly, and thus no one is preventing her from exercising her religion by imposing a religious test that prevents her from volunteering or fostering.

Because Plaintiff has failed plausibly to allege interference with a fundamental right, at most, Governor McMaster's actions would be subject to rational-basis review, under which the actions are presumed valid if they are rationally related to a legitimate government purpose. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 211 (4th Cir. 2002).[11] "The test is not a subjective one," and "[t]he actual motivation for the local government's actions is irrelevant." *Pulte Homes Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018) (citations omitted) (internal brackets omitted). "Under this standard, a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312,

---

[11] It is appropriate at this stage of litigation to analyze whether a plaintiff has alleged a claim sufficient to overcome the presumption of rationality. *See, e.g., Freilich*, 313 F.3d at 211 (affirming the District Court's dismissal pursuant to Rule 12(b) of claims under the Equal Protection and Due Process clauses, concluding the challenged conduct was rationally related to a legitimate government interest); *see also Shanks v. Forsyth Cty. Park Auth.*, 869 F. Supp. 1231, 1236–37 (M.D.N.C. 1994) (dismissing an Equal Protection claim pursuant to Rule 12(b)(6) because, even taking plaintiff's allegations as true, plaintiff "has not alleged facts sufficient to overcome the presumption of rationality coupled with a readily apparent justification for the ban.").

320 (1993)). Rather, Governor McMaster's actions "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for" the actions. *Id.* (citation and internal quotation marks omitted).

There are numerous legitimate government purposes for requesting the deviation and issuing Executive Order No. 2018-12. For instance, South Carolina has legitimate (and even compelling) interests in:

(1) Increasing community support and options for foster child placement by maximizing the number and diversity of CPAs, *see Lipscomb ex rel. DeFehr v. Simmons*, 962 F.2d 1374, 1380 (9th Cir. 1992) (en banc) (state has a "legitimate purpose of maximizing the level of benefits available to all the children in the foster care program"); (*see also* Compl. ¶¶ 1, 3, 6, 94, 96, 98–99, 107, 114–15 (acknowledging South Carolina's interest in maximizing placement opportunities for foster children));[12]

(2) Avoiding unnecessary violations of faith-based CPAs' free-exercise rights that would result from forcing them to renounce their beliefs in order to participate in generally available state programs, *see Trinity Lutheran*, 137 S. Ct. at 2022 ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties." (cleaned up) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978))); *Forest Hills Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 241 (4th Cir. 1984) ("[W]e cannot question the appropriateness of the state's seeking to defend [a] challenged exemption . . . on the basis that the accommodation it makes to the activities of 'religious institutions' was constitutionally compelled or at least constitutionally permitted by reason of the existence of free exercise rights in those institutions . . . . Protection of constitutional rights can properly be advanced by government as justification for governmental action that is under challenge for violation of other constitutional rights." (citing *Widmar v. Vincent*, 454 U.S. 263 (1981)));

(3) Avoiding unnecessary violations of faith-based CPAs' free-speech and associational rights that would result from forcing them to partner with unwelcome individuals who perform ministerial functions[13] in order to participate in generally available state

---

[12] As part of rational-basis review, courts may not invalidate the action merely because they or a plaintiff, after weighing the relative costs and benefits, would have chosen a different policy to effectuate the purpose. *See Lipscomb*, 962 F.2d at 1380–81. Plaintiff's own policy preferences for achieving maximum foster care placement opportunities provide no ground to challenge Governor McMaster's actions.

[13] The Fourth Circuit has yet to address the scope of positions constituting ministerial functions following the *Hosana-Tabor* decision. *See Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 813 (D.S.C. 2018). The "general rule," however, established by decades of precedent is that if an employee's duties "consist of teaching [or] spreading the faith," then "the ministerial exception

22

programs, *see Hosana-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188–89 (2012) ("By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments . . . [and] also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."); *Dale*, 530 U.S. at 648 ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."); *Roberts*, 468 U.S. at 622 ("Government actions that may unconstitutionally infringe upon th[e] freedom [to associate with others] can [include] . . . withhold[ing] benefits from individuals because of their membership in a disfavored group . . . and . . . interfer[ing] with the internal organization of the group . . . ."); *see also Widmar*, 454 U.S. at 271 ("[T]he interest of the [state] in complying with its constitutional obligations may be characterized as compelling"); and

(4) Avoiding unnecessary entanglement in religion that would result from the enforcement of its religious-matching statute and regulation in the absence of faith-based CPAs, *see* S.C. Code. Ann. § 63-15-20 (requiring courts to place children with person or agency of the same religious faith as natural parents whenever practicable); S.C. Code Ann. Regs. 114-550(H)(11) (requiring that foster child's religious education be in accordance with express wishes of natural parents); Joseph R. Ganahl, *Foster Free Exercise*, 88 NOTRE DAME L. REV. 457, 472 (2012) ("Considering the significant number of entangling issues that may arise as the State makes reasonable efforts to provide for the religious formation of children in its care, the ideal solution is for a State to contract with religious foster care agencies."); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("[A] state interest in avoiding an Establishment Clause violation 'may be characterized as compelling' . . . ." (quoting *Widmar*, 454 U.S. at 271)).[14]

Governor McMaster's actions are rationally related to achieving these (as well as other)

legitimate purposes because they operate to maximize the number and diversity of CPAs and help

to avoid violations of CPAs' constitutional rights. Because Plaintiff fails to identify a fundamental

---

applies." *E.E.O.C. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)); *see also Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015) (recognizing and applying *Hosanna-Tabor*'s "ministerial exception" to para-church organizations and to employees who performed a "spiritual formation" role but who did not have the formal title or training of a minister); *Rogers v. Salvation Army*, 2015 WL 2186007 (E.D. Mich., May 11, 2015) (same).

[14] Plaintiff does not challenge South Carolina's religious-matching statute or regulation; in fact, her complaint champions them. (*See* Compl. ¶¶ 108–12.)

right, allege conduct violating any substantive Due Process right, or plausibly allege interference with a right and because the challenged actions are rationally related to achieving a legitimate state interest, her Due Process Clause claim against Governor McMaster must be dismissed.

### C.     Plaintiff fails to state a claim for an Equal Protection Clause violation.

Plaintiff alleges that Governor McMaster's actions violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against her on the basis of religion. (*See* Compl. ¶¶ 148–57). Under equal protection analysis, if a classification "impinges upon a fundamental right protected by the Constitution or operates to the particular disadvantage of a suspect class," the classification receives strict scrutiny, while other classifications "will be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 172 (2000). Importantly, "[t]he Constitution's protections of individual liberty and equal protection apply in general only to action *by the government*." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (emphasis added). Here, the facts alleged in the complaint show only that Governor McMaster affirmatively did not discriminate on the basis of religion and that any alleged religious "discrimination" is attributable to Miracle Hill, which is not a state actor, rather than to Governor McMaster.

In the context of an equal protection claim, government actions "discriminating *among* religions are subject to strict scrutiny," but actions "affording a uniform benefit to *all* religions" are assessed under rational basis review. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (internal quotation marks omitted). In the latter case, "where a [policy] is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, [there is] no justification for

applying strict scrutiny," and "[t]he proper inquiry is whether [the government] has chosen a rational classification to further a legitimate end." *Id.*

Plaintiff has not plausibly alleged—nor can she—that Governor McMaster's challenged actions discriminate among religions. On its face, Governor McMaster's request for a deviation (a document the Complaint relies upon and incorporates by reference) does not differentiate among religious beliefs, but instead asks for a deviation applicable to *all* faith-based CPAs, specifically so that *no* "religious organization" would have "to choose between the tenets of its faith or applying for a CPA license to serve the children of South Carolina." (Ex. A, at 2.) This fact is confirmed in HHS's response, which grants a deviation to *any* faith-based CPA that would be affected by HHS's new regulation. (*See* Ex. C, at 4.) Likewise, Executive Order No. 2018-12 does not discriminate against any religious belief but, instead, expressly directs that *no* faith-based CPAs "be den[ied] licensure . . . solely on account of their religious identity or sincerely held religious beliefs" and that DSS and other agencies ensure that *no* person or organization is "directly or indirectly penalize[d] [for] religious identity or activity . . . by denying *any* person or organization an equal share of . . . benefits . . . solely on account of religious identity or beliefs." Exec. Order No. 2018-12, at 3 (emphasis added). Both the request and the Order are facially neutral with respect to religion and, at most, might be said to afford a uniform benefit to *all* religions.

The complaint alleges only that a *private* entity engaged in religious discrimination—not Governor McMaster. Because Miracle Hill is not a state actor, its private actions are neither circumscribed by the Equal Protection Clause nor actionable here. *See Edmonson*, 500 U.S. at 619; *Cox v. Duke Energy Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) ("Merely private conduct, no matter how discriminatory or wrongful, is excluded from the reach of[ 42 U.S.C.] § 1983.") (citation and internal quotation marks omitted). A private entity's conduct will be regarded as state action only

if the entity in all fairness can be described as a state actor and its conduct is fairly attributable to the state. *See Mentavlos v. Anderson*, 249 F.3d 301, 313 (4th Cir. 2001); *United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995). Plaintiff does not allege that Miracle Hill is a state actor or that its conduct is fairly attributable to the state, and neither Miracle Hill nor its conduct meets any of the myriad tests for determining that otherwise private conduct should be deemed state action. *See Mentavlos*, 249 F.3d at 313–14; *Gaston Festivals*, 43 F.3d at 906–10. Indeed, the Fourth Circuit and this Court have consistently concluded that private parties providing foster care services are not state actors. *See*, *e.g.*, *Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *Pullings v. Jackson*, No. 2:07-0912-MBS, 2007 WL 1726528, at *3 (D.S.C. June 13, 2007); *see also Weller v. Dept. of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 392 (4th Cir. 1990).

Plaintiff only challenges Governor McMaster's actions requesting a deviation and issuing the Executive Order. Because these actions are facially neutral with respect to religion and designed to limit South Carolina's interference with religious exercise, they are subject to rational basis review. *See Amos*, 483 U.S. at 339. These actions easily pass muster under that deferential standard for the same reasons they do so under substantive due process analysis. *See* Part II.B, *supra*. Accordingly, Plaintiff's equal protection claim should be dismissed under Rule 12(b)(6).

### D.    Plaintiff fails to state a claim for an Establishment Clause violation.

Finally, Plaintiff alleges Governor McMaster's challenged actions constituted an impermissible establishment of religion. As explained more fully below, however, a State's licensure of, accommodation of, and contracting with faith-based providers is permissible under the Establishment Clause and its state analogue.[15] Such partnerships are historically permissible,

---

[15] The relevant South Carolina and federal constitutional provisions are sufficiently similar that

have been upheld by the courts, and are supported by a legitimate secular purpose that neither advances religion nor excessively entangles the State with it. Further, such accommodations are permitted—and in some cases, required—by state and federal law and Supreme Court precedent.

        *1.*     *The Establishment Clause does not prohibit government partnerships and contracts with religious organizations.*

Plaintiff alleges the State's accommodation of and contracts with religious child welfare providers violate the Establishment Clause. (*See* Compl. at ¶¶ 121–33.) Even assuming the factual allegations of the Complaint to be true, Plaintiff has not alleged a plausible claim that Governor McMaster's challenged actions violate the Establishment Clause. The exact types of conduct Plaintiff challenges here have long been held to be permissible under the Establishment Clause.

The Supreme Court has recently stated the "Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1819 (2014) (internal quotation marks omitted); *accord Hosanna-Tabor v. EEOC*, 565 U.S. 171 (2012) (closely examining historical understanding to determine the contours of an Establishment Clause claim). State and federal governments have been partnering and contracting with religious ministries to provide a variety of services to vulnerable populations for hundreds of years. *See generally* Edward Queen, *History, Hysteria, and Hype: Government Contracting with Faith-Based Social Service Agencies*, Religions 2017 at 4–5 (2017); Tracey L. Meares & Kelsi Brown Corkran, *When 2 or 3 Come Together*, 48 WM. & MARY L. REV. 1315, 1372 (2007); Martha Minow, *Public and Private Partnerships: Accounting for the New Religion*, 116 HARV. L. REV.

---

the same reasoning and analysis applies to both. *See Hunt v. McNair*, 187 S.E.2d 645, 649 (S.C. 1972), *aff'd* 413 U.S. 734 (1973) ("The language of the first amendment to the Constitution of the United States and the language of Article 1, Section [2], of the Constitution of South Carolina are, for all intents and purposes, the same," and the same "reasoning is applicable to both constitutional provisions.").

1229, 1238 (2003); Carl H. Esbeck, *Government Regulation of Religiously Based Social Services: The First Amendment Considerations*, 19 HASTINGS L.Q. 343, 350 (1992); *see also* 114 Cong. Rec. H3288 (daily ed. May 26, 2016) (statement of Rep. Russell) ("More than 2,000 Federal Government contracts a year are awarded to religious organizations and contractors that provide essential services in many vital programs.").

The Supreme Court and lower federal courts have upheld such contracts and partnerships against Establishment Clause challenges. *See*, *e.g.*, *Bowen v. Kendrick*, 487 U.S. 589 (1988) (holding the direct federal funding of faith-based counseling centers to provide social services did not violate the Establishment Clause, and noting "that this Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs"); *Bradfield v. Roberts*, 175 U.S. 291 (1899) (holding federal contract with a Roman Catholic hospital operated by nuns to serve the poor did not violate the Establishment Clause); *Hartmann v. Stone*, 68 F.3d 973 (6th Cir. 1995) (holding the Army did not violate the Establishment Clause by providing funding to religious childcare providers who engage in religious practices during the daycare time).[16]

---

[16] The Supreme Court and lower courts have repeatedly reached this conclusion in other contexts too, holding the government does not violate the Establishment Clause when it provides official recognition, benefits, and funds to religious groups on the same basis as to secular groups. *See Mitchell v. Helms*, 530 U.S. 793 (2000) (plurality op.) (holding the provision of public funds to private elementary and secondary schools—including sectarian ones—was permissible under the Establishment Clause); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 842–44 (1995) (holding a public university's provision of facilities and services to a religious group on the same bases as to secular groups does not violate the Establishment Clause); *Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 247–50 (1990) (holding public school's policy giving official recognition and benefits to a religious student group on the same basis as to secular student groups did not violate the Establishment Clause); *Widmar*, 454 U.S. at 274 (same); *Comm. for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646 (1980) (holding state's reimbursement of religious schools for testing and reporting services was permissible under Establishment Clause); *Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084 (8th Cir. 2000) (holding federal statute did not violate Establishment Clause by permitting persons with

In *Bowen*, for example, the Supreme Court upheld the constitutionality of a government program that partnered with organizations "that were affiliated with religious denominations and that had corporate requirements that the organizations abide by religious doctrines" to provide publicly funded social services. *Bowen*, 487 U.S. at 599. The Court reached this holding even though the law "*expressly contemplated* that some of those moneys might go to projects involving religious groups." *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 607 (2007) (discussing *Bowen*) (emphasis added). The *Bowen* Court specifically rejected the claim "that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs," *id*. at 608, and noted that a "symbolic link" between the religious organization and the government was not an establishment of religion, *id*. at 613.

Further, courts are particularly skeptical of Establishment Clause claims where, as here, the government partners with an array of religious and secular social service providers from which participants can freely choose. *See Freedom from Religion Found., Inc. v. McCallum*, 324 F.3d 880 (7th Cir. 2003) (finding no Establishment Clause violation when government contracts with, and offers parolees the option to choose from among, a list of religious and secular halfway houses) (citing *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)). Thus, when participants have a "genuine choice," and funding is available without regard to a provider's religious status, and participants can choose to partner with either religious or wholly secular providers, no Establishment Clause issues inhere. *Ams. United for the Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 425 (8th Cir. 2007). In short, the government's accommodation of, contracting with, and provision of funding to child welfare providers—including religious ones—does not

religious objections to medical care to receive government funding for care rendered at religious nonmedical health care institutions, *i.e.*, Christian Science sanitariums).

violate the Establishment Clause.

2.    *Even under the outdated* Lemon *test, the Establishment Clause is not offended by state licensure of and contracting with religious providers and parents.*

As noted above, the Supreme Court's recent Establishment Clause precedent has consistently and repeatedly relied on a historically informed analysis rather than the test established by *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[17] But even if this Court were to apply the *Lemon* test,[18] the government's licensure of and contracting with religious agencies complies with the Establishment Clause.

First, the government's accommodation of and cooperation with faith-based providers and parents achieves the undoubtedly legitimate "secular purpose" of having as many qualified foster and adoption agencies and homes as possible. *See generally N. Valley Baptist Church v. McMahon*, 696 F. Supp. 518 (E.D. Cal. 1988) (holding the purpose of a preschool daycare program, established as a religiously-motivated "ministry" to address "physical, spiritual, or emotional" needs was "secular, not religious, in nature," and thus a state DSS licensing and regulatory scheme applicable to daycares did not raise Establishment Clause concerns), *aff'd* 893 F.2d 1139 (9th Cir. 1989); *see also Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 12 n.2 (1989) (plurality op.) (noting a state may reasonably conclude "that religious groups generally contribute to the cultural and moral

---

[17] *See Town of Greece*, 134 S. Ct. at 1819 (declining to apply *Lemon* and instead stating "the Establishment Clause must be interpreted by reference to historical practices and understandings"); *Hosanna-Tabor*, 565 U.S. 171 (ignoring *Lemon*); *Zelman*, 536 U.S. 639 (same); *Good News Club*, 533 U.S. 98 (same). In addition, members of the Supreme Court have repeatedly criticized the *Lemon* test. *See Utah Highway Patrol Ass'n v. Am. Atheists, Inc*., 132 S. Ct. 12, 12–23 (2011) (Thomas, J., dissenting); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 398 (1993) (Scalia, J., concurring); *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality); *Green v. Haskell Cty. Bd. of Comm'rs*, 574 F.3d 1235, 1245 (10th Cir. 2009) (Gorsuch, J., dissenting).

[18] *See Lemon*, 403 U.S. at 612–13 ("First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'").

improvement of the community . . . and enhance a desirable pluralism of viewpoint and enterprise."); *Gaylord v. Mnuchin*, No. 18-1277, ___ F.3d ___, 2019 WL 1217647, at *7–9 (7th Cir., March 15, 2019) (upholding an exemption challenged on Establishment Clause grounds and holding the avoidance of governmental interference with religious groups' decision-making and operations was itself a legitimate secular purpose).

Second, the principal effect of accommodating religious providers "neither advances nor inhibits religion." A reasonable observer would see the accommodation as the government's good faith effort to generate the greatest possible number of qualified foster and adoptive homes. This perception would be reinforced by the fact known to any reasonable observer that the State of South Carolina and its agencies work with *all* qualified individuals and foster agencies regardless of the agency's or individual's religion. *See Mitchell v. Helms*, 530 U.S. 793, 809 (2000) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government.").

Third, the government's licensure of and contracting with private religious providers and parents while *avoiding* interference with or involvement in their religious beliefs or practices avoids any excessive entanglement with religion. A federal district court has articulated why state supervision of religious child services providers does not entail the "excessive governmental entanglement with religion" forbidden by *Lemon*:

> Some incidental entanglement between church and state authority is inescapable. . . . The central focus should be on the extent that the state becomes involved in *religious* affairs or doctrine. *Walz v. Tax Commission of the City of New York*, 397 U.S. 664 (1970). The state may involve itself . . . in the purely secular affairs of religious organizations. *Id.*

*       *       *

31

> The licensing scheme clearly establishes a pervasive regulatory relationship, complete with ongoing monitoring and supervision. That relationship, however, in no manner affects the religious objectives of the Preschool. Rather, the state can and in the past has implemented its licensing scheme without involving itself in any doctrinal matters of the Preschool or the Church. In the context of direct aid programs, even pervasive monitoring schemes are upheld where the state need not assess doctrinal matters to implement the program.

*N. Valley Baptist Church*, 696 F. Supp. at 534–36. In short, even assuming *Lemon* is still the controlling legal test, state licensure of, contracting with, and accommodation of religious child welfare providers and parents does not run afoul of the Establishment Clause.

       3.    *The accommodation of faith-based providers' constitutional and statutory rights cannot constitute an establishment of religion.*

Plaintiff's Establishment Clause claim seeks to turn the law on its head by penalizing Governor McMaster for doing what is permitted and, in some instances—including here—is *required* by the First Amendment, by Supreme Court precedent, and by state and federal law. The Supreme Court "has long recognized that the government . . . may accommodate religious practices without violating the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005). *See also Amos*, 483 U.S. at 338 (1987) (upholding exemption of religious organizations from antidiscrimination laws, even as to employees such as building engineers, and noting "there is ample room for accommodation of religion under the Establishment Clause").

Such accommodations are, in some situations, mandatory. For example, the Constitution and Supreme Court precedent not only permit but *require* the government to allow faith-based groups to consider an individual's beliefs and behaviors when making employment decisions related to employees whose role and functions include religious teaching, guidance, counseling, mentoring, and spiritual formation. *See Hosanna-Tabor*, 565 U.S. 171. The "general rule" established by decades of precedent is that, if an employee's duties "consist of teaching [or]

spreading the faith," then "the ministerial exception applies." *Roman Catholic Diocese of Raleigh*, 213 F.3d at 801 (quoting *Rayburn*, 772 F.2d at 1169); *accord Shaliehsabou v. Hebrew Home of Greater Washington*, 363 F.3d 299, 308 (4th Cir. 2004); *see also Conlon*, 777 F.3d 829 (recognizing and applying *Hosanna-Tabor's* "ministerial exception" to para-church organizations and to employees who performed a "spiritual formation" role but who did not have the formal title or training of a minister); *Rogers*, 2015 WL 2186007 (same).

Likewise, the Constitution and binding precedent *require* the government to accommodate faith-based providers' free association rights when making personnel recruiting, screening, and selection decisions. *See Dale*, 530 U.S. 640 (holding the application of a state anti-discrimination statute to require the Boy Scouts to allow an avowed homosexual and gay rights activist to serve as an assistant scoutmaster violated Boy Scouts' First Amendment right of expressive association).[19] Similarly, the government's accommodation of Miracle Hill and other religious providers is required by South Carolina's Religious Freedom Act ("RFA"), S.C. Code Ann. §§ 1-32-10 to -60, and the analogous federal RFRA.

---

[19] The Supreme Court has noted that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622; *see also Disabato v. S.C. Ass'n of Sch. Admin.*, 746 S.E.2d 329, 335 (S.C. 2013) ("The United States Supreme Court has interpreted the First Amendment as encompassing an implicit right to associate for the purpose of engaging in speech and the other activities protected by the First Amendment."). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is 'intrusion into the internal structure or affairs of an association" like a "regulation that forces the group to accept members it does not desire." *Dale*, 530 U.S. at 648; *see also Roberts*, 468 U.S. at 623 ("Freedom of association . . . plainly presupposes a freedom not to associate."); *Disabato*, 746 S.E.2d at 335 ("Among the protections afforded by the freedom of association are the rights not to associate . . . and to be free from governmental interference with the internal affairs and organization of one's associations."). Accordingly, the government's demand that an organization accept leaders and volunteers whose beliefs and behaviors differ from the organization's infringes on the organization's associational right. *Dale*, 530 at 654–58.

Further, refusing to accommodate religious organizations and preventing them from participating in government programs would create a clear Free Exercise problem. *See Trinity Lutheran*, 137 S. Ct. at 2025 (holding the state's policy of "expressly denying a qualified religious entity a public benefit solely because of its religious character . . . goes too far" and "violates the Free Exercise Clause"); *Hartmann*, 68 F.3d 973 (striking down an Army regulation prohibiting on-base child care providers from engaging in religious exercise, holding that even where the Army funded, insured, and owned the facilities, and reimbursed provider costs, the Army's goal of avoiding entanglement with religion was an insufficient basis to encroach on the providers' First Amendment rights).[20]

In short, the government's accommodation of faith-based child welfare providers is not only permitted by the First Amendment, it is *required* by decades of Supreme Court precedent, state and federal law, and the First Amendment itself.

## III. CONCLUSION.

For the foregoing reasons, the court should dismiss with prejudice Plaintiff's claims asserted against Governor McMaster in his official capacity as Governor of South Carolina (Counts III, VI, and VII).

---

[20] *See also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring) ("[T]he Religion Clauses . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1239 (11th Cir. 2004) ("[T]o deny equal treatment to a [religious organization] on the grounds that it conveys religious ideas is is to penalize it for being religious. Such unequal treatment is impermissible based on the precepts of the Free Exercise, Establishment and Equal Protection Clauses."); *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) (holding a public university erred by revoking a religious student group's status due to its requirement that its student leaders adhere to beliefs and behaviors consistent with its religious tenets).

Respectfully submitted

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  s/ Miles E. Coleman
    Miles E. Coleman
    Federal Bar No. 11594
    E-Mail: miles.coleman@nelsonmullins.com
    Jay T. Thompson
    Federal Bar No. 09846
    E-Mail: jay.thompson@nelsonmullins.com
    Ethan J. Bercot
    Federal Bar No. 12830
    E-Mail: ethan.bercot@nelsonmullins.com
    1320 Main Street / 17th Floor
    Post Office Box 11070 (29211-1070)
    Columbia, SC  29201
    (803) 799-2000

OFFICE OF THE ATTORNEY GENERAL

    Robert D. Cook, South Carolina Solicitor General
    Federal Bar No. 285
    E-Mail: bcook@scag.gov
    Post Office Box 11549
    Columbia, SC  29211
    (803) 734-3970

*Attorneys for Governor Henry McMaster*

Greenville, South Carolina
March 19, 2019