**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| Aimee Maddonna, ) | |
| ) | Civil Action No. 6:19-cv-00448-TMC |
| Plaintiff, ) | |
| ) | |
| v. ) | **DEFENDANT HENRY MCMASTER'S** |
| ) | **BRIEF IN RESPONSE TO THE** |
| United States Department of Health and ) | **COURT'S ORDER** |
| Human Services, et al., ) | |
| ) | |
| Defendants. ) | |

COMES NOW Defendant Henry McMaster, in his official capacity as Governor of South Carolina, and respectfully files this brief in response to the court's August 6, 2019 text order directing the parties to file a brief specifying how a new development, namely a change in the policies of Miracle Hill Ministries ("Miracle Hill"), affects this case, if at all. (ECF No. 50.) As explained more fully below, the recent policy change aptly illustrates why the court should dismiss the case for the reasons offered in the pending motions to dismiss. Plaintiff's suit, which was already based on speculation and supposition before the policy change, presents an even more speculative and hypothetical scenario now. Her lack of standing, which was already apparent, is even more glaring now. Her claim that the Governor's actions favored Protestant evangelical Christianity over other denominations and thereby established it as the State's religion—a claim that was already factually unsupported and legally unsupportable—is now facially absurd. Her already untenable claims that the Governor deprived her of due process rights and equal protection by supposedly sanctioning anti-Catholic bias are plainly baseless now. In short, the reasons for dismissal explained in the pending motions to dismiss are only stronger now than they were before the policy change.

**I.     BACKGROUND**

Plaintiff commenced this action by filing a complaint on February 15, 2019 accusing the Governor of three constitutional violations arising from his decision to accommodate the rights of all faith-based Child Placing Agencies ("CPAs") and to withhold the imposition of penalties on them.

(*See* ECF No. 1.) She leveled similar claims against the then-Acting Director of the South Carolina Department of Social Services ("DSS") and various federal officials and entities. (*Id.*) Plaintiff's claims arose from the Defendants' alleged failure to penalize one private CPA—Miracle Hill, which she did not name as a defendant in this suit—for its alleged practice of partnering only with foster parents and volunteers who share what Plaintiff calls its "evangelical Christian religious beliefs." (*Id.* ¶¶ 3, 40–42, 44, 69–74, 96, 106.) Plaintiff acknowledges she never formally applied to be a foster parent or volunteer with Miracle Hill (or with any other CPA or with DSS itself), but speculates that Miracle Hill would not have accepted her if she had applied as a foster parent or volunteer because she is Roman Catholic. (*See id.* ¶¶ 24–25, 31–35, 37–43, 49, 96–97, 138, 153.)

Defendants filed motions to dismiss the complaint on the grounds that Plaintiff lacks standing to bring the claims she has asserted and that, in any event, the complaint fails to state a claim for which relief could be granted. (*See* ECF Nos. 12, 18, 29.) Briefing on Defendants' motions was completed on June 10, 2019. (*See* ECF No. 42.)

After briefing on the motions had been completed, counsel for Governor McMaster learned of a change in Miracle Hill's policies through reports in local media outlets on July 11 and 12, 2019 discussing a Miracle Hill press release. *See, e.g.*, Nathaniel Cary, *Miracle Hill changes foster care policy, will recruit Catholic, Orthodox Christian parents*, Greenville News, July 11, 2019 (attached hereto as **Exhibit A**);[1] *see also* Press Release, Miracle Hill Ministries, *Miracle Hill Ministries Strengthens Christian Identity by Opening Foster Program to Catholic Foster Parents* (July 5, 2019) (attached hereto as **Exhibit B**).[2] The press release states that Miracle Hill has decided to "open[] the door for Catholics who affirm Miracle Hill's doctrinal statement in belief and practice to serve as foster parents and employees." Ex. B at 1.

---

[1] *Available at* https://www.greenvilleonline.com/story/news/2019/07/11/protestant-evangelical-sc-foster-care-miracle-hill-ministries-changes-policy-catholic-parents/1687602001/.

[2] In his July 17, 2019 Supplement notifying the court of this development, Governor McMaster's discussion of the press release cited the location on Miracle Hill's website where it could at that time be found. (*See* ECF No. 46 at 2 n.2.) It appears Miracle Hill's website subsequently underwent a redesign, and the press release is no longer available at the previously cited URL.

After learning of these developments, counsel for Governor McMaster contacted counsel for Plaintiff to confer regarding the change in Miracle Hill's policies. Counsel for all parties conferred on July 16, 2019. Plaintiff's counsel expressed the view that the policy change does not moot the suit or alter the analysis of her pending claims. On July 17, 2019, Governor McMaster filed a supplement to his motion to dismiss, informing the court of these developments and stating that, even assuming the policy change does not moot the case or alter the analysis of Plaintiff's pending claims, the claims against Governor McMaster should nonetheless be dismissed for the reasons stated in his motion to dismiss, and that counsel was prepared to brief the issue if the court so directed. (ECF No. 46.) Thereafter, by an August 6, 2019 text order, the court directed the parties to "file a brief specifying how this new development affects this case, if at all." (ECF No. 50.) This brief is submitted in response to that order.

**II.    ARGUMENT**

Even assuming *arguendo* that the recent change in Miracle Hill's policy does not alter the proper analysis to be applied to Plaintiff's claims and to the Defendants' motions to dismiss, the inquiry occasioned by the policy change serves to further display in striking features a number of reasons why the court should dismiss this case on the grounds raised in Defendants' pending motions to dismiss, including Plaintiff's failure to state a claim on which relief may be granted and her lack of standing.[3]

---

[3] Governor McMaster does not at this time argue that the case is moot. The question of mootness depends in part on whether Plaintiff is willing and able to satisfy Miracle Hill's new criteria and whether Miracle Hill would partner with her if she were to apply. The parties do not know what Miracle Hill might do if she applied (since the Governor is not aware of her having done so), and the Governor does not at this stage have a basis to dispute her subjective attestation that she cannot or will not satisfy the new criteria. Notably, however, the doctrine of mootness implicates a court's subject matter jurisdiction. *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017). It thus cannot be waived and can be raised at any time. *See Castendet-Lewis v. Sessions*, 855 F.3d 253, 259–60 (4th Cir. 2017); *Cook v. Bennett*, 792 F.3d 1294, 1299 n.3 (11th Cir. 2015). Accordingly, subsequent developments or analysis in this proceeding could alter the Governor's position regarding the mootness of this suit, and he reserves the right to assert such a position and seek suitable relief if and when appropriate.

*First*, Plaintiff has failed to assert an injury to a legally protected interest because the injury she alleges was speculative—both before the policy change and now. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972); *S. Blasting Servs., Inc. v. Wilkes Cty.*, 288 F.3d 584, 595 (4th Cir. 2002). Plaintiff's claims rely heavily on the implication that Miracle Hill supposedly "rejected" her application to volunteer and prevented her from obtaining a foster care license. The allegations in Plaintiff's complaint, however, demonstrate that Miracle Hill was never afforded an opportunity to consider Plaintiff's application because she never actually applied to be a foster volunteer or parent with Miracle Hill.[4] *If* Plaintiff had been rejected as a volunteer or been prevented from obtaining a foster license, *then* conceivably Miracle Hill's policy change might have some effect on this case (*i.e.*, perhaps Plaintiff would have to re-apply to volunteer to see if Miracle Hill would again reject her and thus preserve her personal stake in the outcome of this case). Instead, the fact that Plaintiff never applied and received an answer prior to filing this suit and, apparently, has not done so since Miracle Hill's policy change demonstrates that she stands in the same speculative position now, after the policy change, as she did before.

*Second*, Miracle Hill's unilateral and independent choice to alter its policies further demonstrates that now, just as before, the injury Plaintiff asserts is not fairly traceable to Governor McMaster. Rather, both before and after the recent policy change, the alleged injury was caused by Miracle Hill, a third-party private organization, making an independent decision for which Governor McMaster has removed any incentive. *See Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Frank Krasner Enters. Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234–35 (4th Cir. 2005). The recent policy change shows that Miracle Hill's choices in this area remain truly unfettered by governmental coercion. Under the

---

[4] Plaintiff never applied to be a foster parent. At most, all that can be discerned from the complaint is that days prior to filing this suit, Plaintiff "reached out" to Miracle Hill to inquire about volunteering. (*See* ECF No. 1 at ¶ 49.) She did not receive an immediate answer and proceeded to file suit based on her speculation of what Miracle Hill might do if she were to formally apply.

terms of the Executive Order, Miracle Hill remains free to change its policies in ways that invite volunteers from a broader array of religious backgrounds, as it has done here, without any official incentive or disincentive to do so.[5] Miracle Hill's freedom to make independent choices, exemplified by the policy change, demonstrates that any connection between Plaintiff's asserted injury and Governor McMaster's challenged actions are purely speculative.

*Third*, Plaintiff *still* cannot show a non-speculative likelihood that her injury will be redressed by the relief she seeks. The relief Plaintiff seeks in her complaint assumes Miracle Hill would respond to governmental incentive by renouncing its religious convictions as to its association with co-religionists, but this assumption was, at the outset of the case, mere speculation. Following the policy change—which maintained Miracle Hill's stance that it will only work with those who affirm its doctrinal statement, even after intense media pressure brought about by this suit—it remains mere speculation that Miracle Hill would disavow its religious beliefs.

*Fourth*, it now even more clear that Governor McMaster's actions afford uniform treatment to all religions through facially neutral policies motivated by a proper purpose of non-interference with religious exercise and thus are subject only to rational-basis review under equal protection analysis. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987). The waiver request and Executive Order demonstrate clearly enough on their faces that they do not differentiate among religions but instead apply to all faith-based CPAs equally. Miracle Hill's ability to unilaterally change its policy to be more inclusive without any governmental intrusion further demonstrates that Governor McMaster's actions accommodated all

---

[5] In contrast, it is *Plaintiff's* proposed solution that would entangle church and state by forcing the government to intrude into areas of ecclesiological and associational choice—matters of doctrinal belief—to determine which ones are permissible and to penalize those who hold disfavored beliefs by depriving them of the rights and benefits available to other religious groups deemed acceptable to the state. Stated differently, Plaintiff's proposed solution would use the promise of government funding to attempt to incentivize Miracle Hill to renounce its sincerely held religious beliefs regarding association with co-religionists or else be barred from exercising its sincerely held religious belief that it should provide foster care services to needy children.

5

religions uniformly and belies any suggestion by Plaintiff that Governor McMaster's actions were intended to favor any particular religious belief.

*Fifth*, Miracle Hill's policy change provides an apt example of how the government's licensing of and contracting with faith-based CPAs enables it to avoid excessive entanglements in religion. In the absence of faith-based CPAs, the State itself would be obliged to implement its religious-matching statute and regulations, *see* S.C. Code. Ann. § 63-15-20; S.C. Code Ann. Regs. 114-550(H)(11), by tracking each foster parent's religious affiliation and assessing whether the religious beliefs and practices of a foster parent sufficiently match the religious preferences of the foster child's natural parents. Indeed, the State would not only have to monitor a prospective foster parent's faith group or denomination, but also their degree of devotion and the specific contours of their beliefs. The State would, for example, have to determine if a foster couple were sufficiently Catholic to receive a child whose parents wished for placement with a devout Catholic family. For instance, what if the prospective foster parent attended a Catholic church but would affirm a doctrinal statement like that of Miracle Hill's—would she be sufficiently Catholic? She might be sufficiently Catholic for the Diocese of Charleston, but perhaps not for Plaintiff. *See* Ex. A, at 2 (contrasting Plaintiff's assertion that, as a Catholic, she will not or cannot affirm Miracle Hill's doctrinal statement, with the Diocese of Charleston's statement that "'[t]he doctrinal statement of Miracle Hill is consistent with the teachings of the Catholic Church and was affirmed by a diocesan theologian'"). With whom should the State side? The State has a legitimate (and even compelling) interest in avoiding precisely these types of questions that enmesh it doctrinal affairs, *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001), and the religious disagreements raised by Miracle Hill's policy change demonstrate that, in the absence of faith-based CPAs, the State will be repeatedly required to enter the doctrinal fray.

*Sixth*, no one (and certainly not Governor McMaster) has prevented Plaintiff from volunteering with or fostering through the numerous other CPAs in her vicinity or DSS directly. As this recent episode involving Miracle Hill's policy change demonstrates, Plaintiff continues to

be uninterested in what was ostensibly the impetus for commencing her suit—taking advantage of available volunteering and fostering opportunities—and instead seems single-mindedly focused on invalidating policies simply because she disagrees with them. That is not the business of the courts. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011).

*Seventh*, Miracle Hill's policy change and Plaintiff's response to it (at least as indicated in her statements to the press, *see* Ex. A at 1–2) make clear the true nature and intended effect of Plaintiff's claims. This suit does not now, and never did, arise from Governor McMaster picking sides in an interdenominational dispute or favoring one religion over another. The policy change brings this into even clearer focus, for Plaintiff's professed Catholic faith does not hinder her from fostering or volunteering with her CPA of choice. She nevertheless appears intent on keeping her suit alive by disputing particular items in Miracle Hill's doctrinal statement, *see* Ex. A at 1–2,[6] disputes that apparently arise solely from her personal views rather than from the teachings of the Catholic Church.[7] If the court were to countenance this sort of individual, subjective nitpicking as a basis upon which to establish constitutional liability, the effects would be staggering. *Any* statement of doctrinal belief, no matter how ecumenical, is disagreeable in part or in whole to *somebody*. If (as Plaintiff claims) the Constitution forbids the State from licensing or contracting with providers whose religious beliefs are disagreeable to *anyone* or whose religious beliefs might preclude a partnership with *someone*, then the State would be required to exclude *every* social services provider whose ministry is informed and actually influenced by their its beliefs. *That* would pose a First Amendment problem. *See generally Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). What the Governor has done here, however, does not.

---

[6] Plaintiff specifically notes her disagreement with Miracle Hill's beliefs on issues of soteriology, bibliology, and sexual behavior.

[7] Indeed, the Roman Catholic Church has itself endorsed Miracle Hill's doctrinal statement. *See* Ex. A at 2 ("'The Diocese of Charleston welcomes this change to policy as we continue to unite as Christians in service of the poorest and most vulnerable among us,' said Maria Aselage, spokeswoman for the Diocese of Charleston. 'The doctrinal statement of Miracle Hill is consistent with the teachings of the Catholic Church and was affirmed by a diocesan theologian several months ago.'").

The Supreme Court has long recognized that religious accommodations are permissible under the Establishment Clause. *See*, *e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (upholding exemption in Title VII for religious organizations).[8] When, as here, there is a system of "private choice," the actions of religious participants do not violate the Establishment Clause. *Zelman v. Simmons-Harris*, 536 U.S. 639, 662 (2002); *see also Freedom from Religion Found. v. McCallum*, 324 F.3d 880, 883–84 (7th Cir. 2003) (upholding government-funded halfway house program that included religious contractors). Here, the Governor's accommodation of all private religious charities receiving public funds—among the many agencies from which prospective foster parents may choose—follows *Zelman* and *McCallum*, and is a longstanding and historically permissible practice. *See* Edward Queen, *History, Hysteria, and Hype: Government Contracting with Faith-Based Social Service Agencies*, Religions 2017, at 4–5 ("The history of government funding of services provided by private organizations, especially private eleemosynary organizations, is a long one. . . . For example, in 1806 the New York Orphan Asylum, a decidedly Protestant organization, established an orphanage, which, by decade's end, received state monies to support over 200 orphans. . . . Most orphanages during that time were established along religious lines and served orphans of a particular faith. In fact, they were subsidized by New York and other cities for doing exactly that.").

---

[8] Indeed, the longstanding history of religious accommodations in a variety of contexts predate the ratification. By 1776, nearly every colony granted religious exemptions from military service, taking oaths, and paying the remaining church taxes. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1467–71 (1990). The Founders did not view these religious accommodations as establishment. Douglas Laycock, *Regulatory Exemptions of Religious Behavior and the Original Understanding of the Establishment Clause*, 81 NOTRE DAME L. REV. 1793, 1803-08 (2006). That remains true today, when the state and federal governments regularly accommodate religious conscience in a variety of ways. Many states' laws, for instance, give physicians religious accommodations from having to perform executions or assist suicide. *See* Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 EMORY L.J. 121, 137–53 (2012).

**III.   CONCLUSION**

For the foregoing reasons, the court should dismiss the case for the reasons stated in Defendants' motions to dismiss, which Miracle Hill's policy change and the resulting inquiry illustrate and strengthen.

                    Respectfully submitted

                    NELSON MULLINS RILEY & SCARBOROUGH LLP

                    By:  s/ Miles E. Coleman
                        Miles E. Coleman
                        Federal Bar No. 11594
                        E-Mail: miles.coleman@nelsonmullins.com
                        104 S. Main Street, 9th Floor
                        Greenville, SC 29201
                        (864) 373-2352

                        Jay T. Thompson
                        Federal Bar No. 09846
                        E-Mail: jay.thompson@nelsonmullins.com
                        Ethan J. Bercot
                        Federal Bar No. 12830
                        E-Mail: ethan.bercot@nelsonmullins.com
                        1320 Main Street / 17th Floor
                        Post Office Box 11070 (29211-1070)
                        Columbia, SC  29201
                        (803) 799-2000

                  OFFICE OF THE ATTORNEY GENERAL

                        Robert D. Cook, South Carolina Solicitor General
                        Federal Bar No. 285
                        E-Mail: bcook@scag.gov
                        Post Office Box 11549
                        Columbia, SC  29211
                        (803) 734-3970

                  *Attorneys for Governor Henry McMaster*

Greenville, South Carolina
August 20, 2019