IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

AIMEE MADDONNA,

*Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*

*Defendants*.

Civil Docket No. 6:19-cv-448-TMC

**PLAINTIFF'S BRIEF IN RESPONSE TO THE COURT'S AUGUST 6, 2019 ORDER**

On August 6, 2019, the Court directed the parties to specify how, if at all, Miracle Hill Ministries' revised policy affects this case (ECF No. 50). For the following reasons, the revised policy has no effect on the case.

Under its new policy,[1] Miracle Hill says that it no longer categorically excludes Catholics from becoming foster parents or volunteers on the sole basis that they self-identify as Catholic. But critically, Miracle Hill continues to provide governmental services—through a contract with South Carolina funded with federal and state dollars—while simultaneously requiring that, before receiving those services, applicants must affirm agreement with Miracle Hill's evangelical-Protestant "Doctrinal Statement." The Doctrinal Statement is, however, inconsistent with Mrs. Maddonna's faith. She therefore cannot sign it and hence remains barred from volunteering or fostering through Miracle Hill because of her religion. Accordingly, the new factual development

---

[1]    Defendants have thus far provided no affidavit from anyone with actual knowledge of Miracle Hill's policy change or any other admissible evidence of that change or what it entails. For purposes of this briefing, we assume that the current policy is as described in various representations on Miracle Hill's website and in a press release that Miracle Hill issued on July 5, 2019. *See* Ex. 1 (Press Release, Miracle Hill Ministries Strengthens Christian Identity by Opening Foster Program to Catholic Foster Parents (July 5, 2019)).

1

does not diminish Mrs. Maddonna's claims. Instead, it underscores the unconstitutional coercion of religious belief that is happening through this taxpayer-funded program.

1.  *Miracle Hill's Policy Change*

Until recently, Miracle Hill categorically excluded all but evangelical-Protestant Christians from the foster-care services that it administers on behalf of the State of South Carolina. When Mrs. Maddonna sought to become a volunteer mentor to a foster child through Miracle Hill, she was turned away precisely because she is Catholic, despite otherwise being what Miracle Hill deemed a "great fit" for the program. Compl. ¶ 39. Mrs. Maddonna brings claims against two South Carolina officials and a number of federal defendants. The state defendants are the governor, who by executive order exempted Miracle Hill from state antidiscrimination requirements and who petitioned the federal government for a similar exemption from federal antidiscrimination requirements for all South Carolina foster-care placement agencies, and the director of South Carolina's Department of Social Services, who has direct responsibility for licensing, contracting with, and funding foster-care placement agencies in South Carolina. The federal defendants are the U.S. Department of Health and Human Services, Secretary Azar, HHS's Administration for Children and Families, and the Deputy Assistant Secretary in charge of that subagency. They provide federal funds for South Carolina's foster-care program and have exempted Miracle Hill and other South Carolina agencies from federal antidiscrimination requirements so that the organizations may continue to receive that funding while discriminating on the basis of religion in the provision of government-funded services. Collectively, then, Defendants fund, license, and sanction religious discrimination in the operation of a state program and in the provision of governmental services.

Last month, Miracle Hill announced that it would no longer categorically exclude Catholics who seek to become volunteer mentors or foster parents to the children that the State assigns to it.

2

But there is a catch: All prospective foster parents and volunteers must be "followers of Jesus Christ" who are "active in and accountable to a Christian church" and agree "in belief and practice" with Miracle Hill's Doctrinal Statement. Ex. 2 (selection from *Requirements for Miracle Hill's Foster Families*, MIRACLE HILL MINISTRIES, https://bit.ly/2yOQNlS). Potential foster parents and volunteers must affirm and agree to this "belief and practice" by attesting on Miracle Hill's foster-care-inquiry form that they "have read and agree with Miracle Hill's doctrinal statement." Ex. 3 (*Foster Care Inquiry Form*, MIRACLE HILL MINISTRIES, https://bit.ly/2YVIb7C).

The Doctrinal Statement reads:

We Believe . . .

- The Bible to be the only inspired, infallible, inerrant and authoritative Word of God. *2 Tim. 3:16; 2 Pet 1:20-21*

- That there is one God, creator of heaven and earth, eternally existent in three distinctive persons: the Father, Son, and Holy Spirit. *1 Tim. 2:5; Gen 1:1; Mt. 3:16-17; Mt. 28:19; 2 Cor. 13:14; John 10:30*

- In the deity and humanity of Jesus Christ; that He was born of a virgin; that we are redeemed by His atoning death through His shed blood; that He bodily resurrected and ascended into Heaven and that He will come again in power and great glory to judge the living and the dead. *Eph. 1:7-10; Acts 1:9-11; Mt. 1:23-25; 1 Cor. 15:1-8; 2 Tim. 4:1*

- In the value and dignity of all people created in God's image, but alienated from God and each other because of our sin and guilt and justly subject to God's wrath. *Gen. 1:26-27; Psalm 139:13; Mt. 22:37-39; Rom. 12:20-21; Gal. 6:10; Eph. 2:1-3; Rom. 5:12*

- That regeneration by the Holy Spirit by grace through faith is essential for the salvation of lost and sinful people. *Tit. 3:4-7; Eph. 2:8-9; 2 Cor. 6:2*

- In the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ. *Col. 1:13-14; 1 Thess. 4:16-17; John 3:16*

- That the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body—the church. *1 Cor. 12:12-13; 1 Cor. 12:27*

- God ordained the family as the foundational institution of human society. It is composed of persons related to one another by marriage, blood or adoption, and that God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship. *Gen. 1:26-28; Eph. 5:21-6:4; Mt. 19:4-6*

- God creates each person as either male or female, and these two distinct, complementary sexes, together reflect the image and nature of God. *Gen. 1:27; Gen. 2:18*

Ex. 4 (selection from What We Believe: Our Doctrinal Statement, MIRACLE HILL MINISTRIES, https://bit.ly/31qKTDW).

Mrs. Maddonna has reviewed Miracle Hill's Doctrinal Statement. Ex. 5 (Maddonna Decl.) ¶ 6.[2] The Doctrinal Statement is inconsistent with her religious beliefs and her understanding of her faith. *Id.* ¶¶ 7–8. Were she to attest to agreement in belief and practice with the Doctrinal Statement—which Miracle Hill requires as a precondition to participating in the program and partaking of its government-funded foster-care services—Mrs. Maddonna would be forced either to misrepresent her religious beliefs and falsely affirm commitment to religious beliefs that are not her own, or else abandon her own beliefs to adopt the religious beliefs and practices that Miracle Hill favors. *Id.* ¶¶ 9–10. For Mrs. Maddonna, affirming the Doctrinal Statement would be tantamount to leaving the Catholic Church. *Id.* ¶ 9. Because she cannot affirm the Doctrinal Statement, Mrs. Maddonna is no more able to volunteer or foster through Miracle Hill today than

---

[2]    The Court may consider outside evidence, including declarations, when evaluating subject-matter jurisdiction. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)) (when resolving a question of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the district court may "'go beyond the allegations of the complaint and . . . determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding").

she was under the earlier iteration of Miracle Hill's policy, regardless of Miracle Hill's assertion that it no longer categorically excludes Catholics as a matter of course.[3]

> 2. *The New Policy Does Not Diminish Mrs. Maddonna's Claims.*

In her Complaint, Mrs. Maddonna asserts Establishment Clause, Equal Protection, and Due Process claims against all Defendants, and additional claims under the Administrative Procedure Act against the federal defendants, based on Defendants' funding, licensing, and facilitating religious discrimination in the provision of foster-care services by an agency operating under a state contract. Specifically, both the state and federal defendants have explicitly authorized Miracle Hill's religious discrimination by exempting Miracle Hill—and all other faith-based South Carolina child-placement agencies—from generally applicable antidiscrimination requirements.

---

[3]    Mrs. Maddonna acknowledges an article reporting that the Catholic Diocese of Charleston apparently gave the new policy a nod of approval. *See* Nathaniel Cary, *Miracle Hill Changes Foster Care Policy, Will Recruit Catholic, Orthodox Christian Parents*, GREENVILLE NEWS, July 11, 2019, https://bit.ly/33gM4HI. Catholics do not all speak with one voice, even on matters of theology; and hence, not all Catholics share the Charleston Diocese's view. Indeed, while the Diocese of Charleston defended even Miracle Hill's previous policy flatly barring Catholics (Yonat Shimron, *In Fight Over Protestant-Only Foster Agency, Lawsuit Asks: Who Is a Christian?*, RELIGION NEWS SERV., Feb. 25, 2019, https://bit.ly/2NweZjr), at least one local Catholic priest disapproved of it (Yonat Shimron, *S.C. Foster Care Agency Tests Public's Will to Exclude on the Basis of Faith*, RELIGION NEWS SERV., Jan. 30, 2019, https://bit.ly/2TiX561). In all events, the pertinent legal question here is not whether or how Mrs. Maddonna's faith and understanding of Catholic doctrine map onto that of the local diocese. Nor is it whether Miracle Hill's Doctrinal Statement is consistent with Catholic theology. In fact, the Establishment Clause prohibits government from "delegat[ing] discretionary governmental functions"—including, for example, decisions on who is eligible for certain governmental services—"to religious organizations or their members." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1342 (4th Cir. 1995) (city could not delegate enforcement of kosher-food standards to panel of rabbis and lay people selected by Orthodox Jewish associations); *see also Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982) (zoning law giving religious organizations veto power over the granting of liquor licenses to nearby establishments was impermissible delegation of governmental authority). The only question here is whether Mrs. Maddonna continues to be excluded from governmental services because of her religious beliefs. And the answer to that is an unequivocal "yes."

Mrs. Maddonna's claims thus remain essentially unchanged: Miracle Hill continues to impose a religious test on prospective volunteers and foster parents who seek the governmental services that it provides—a test that disfavors and excludes those who do not adhere to the tenets of evangelical Christianity as delineated in the Doctrinal Statement; Mrs. Maddonna does not pass that test; and Defendants continue to fund, license, and sanction the religious discrimination against her. The injury of which Mrs. Maddonna originally complained is therefore ongoing, and Mrs. Maddonna still requests that this Court redress that injury by prohibiting Defendants from funding and licensing entities that use public funds to provide these governmental services on a discriminatory basis.

It is of no moment that Mrs. Maddonna's exclusion comes now in the form of a requirement that she sign and attest to belief in and practice of an evangelical-Christian doctrinal statement, rather than a categorical ban on all non-evangelical Christians. A law that distinguishes between the characteristics of religions, and thus "makes explicit and deliberate distinctions between different religious organizations," grants denominational preferences in violation of the Establishment Clause. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (applying strict scrutiny to, and holding unconstitutional, a Minnesota law that imposed more burdensome requirements on religious organizations that obtained more than half their funding from door-to-door solicitations, because the differential treatment constituted an impermissible denominational preference against those faiths that relied primarily on solicitation to raise funds). As in *Larson*, that is true whether the favoritism comes in the form of specifically naming the favored or disfavored denomination, or instead by favoring or disfavoring characteristics or actions that attach to particular faiths or denominations. *See id*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–33 (1993) (incorporating Establishment Clause prohibition against denominational

preferences into free-exercise jurisprudence to conclude that city's ban on religious practices of disfavored faith violated Free Exercise Clause).

Hence, it does not matter whether Miracle Hill now distinguishes between evangelical Christianity and Catholicism formally, as a categorical designation, or functionally. It still imposes a denominational preference against those whose faith does not align with its Doctrinal Statement. So the state and federal governments' funding and licensing of that discrimination remains unconstitutional. "[T]he Free Exercise Clause, the Establishment Clause, . . . and the Equal Protection Clause as applied to religion[ ]all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring).

Relatedly, the Establishment Clause forbids government to coerce anyone "to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Here, Miracle Hill requires affirmance "in belief and practice" of its evangelical-Christian Doctrinal Statement as a precondition to becoming a volunteer mentor or foster parent. For Mrs. Maddonna and those situated like her, this government-funded, government-sanctioned scheme poses a quintessentially coercive choice: Hew to the dictates of your religious beliefs and forgo the taxpayer-funded governmental service, or compromise your beliefs to participate on the same terms as everyone else. Individuals are thus compelled to forfeit their religious beliefs to obtain a governmental service. This the Establishment Clause forbids. *See, e.g.*, *Lee*, 505 U.S. at 592 (noting that even "subtle coercive pressure" constitutes an Establishment Clause violation).

### 3.  *Mrs. Maddonna's Claims Are Not Mooted by Miracle Hill's Policy Change.*

Because the factual circumstances surrounding Mrs. Maddonna's claims have not meaningfully changed, there can be no serious contention that Miracle Hill's new policy renders

her claims moot. A case becomes moot only "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 368 (4th Cir. 2015) (quoting *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 442 (1984)). Here, the changed policy is just as problematic, and for just the same reasons, as the one in effect when this suit commenced. Mrs. Maddonna retains a concrete interest in the case because she continues to experience discrimination on the basis of religion when seeking governmental services. And her injury would be remedied by the relief that she seeks from this Court.

Moreover, even if Miracle Hill's new policy had actually changed the factual circumstances of this case, Mrs. Maddonna's claims still would not be rendered moot. A party should not be able to evade judicial review by temporarily altering questionable behavior. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66–67 (1987) ("Mootness doctrine . . . protects plaintiffs from defendants who seek to evade sanction by predictable 'protestations of repentance and reform.'") (quoting *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)); *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (voluntary-cessation doctrine exists "to prevent a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after") (internal quotations omitted). Defendants bear a "heavy burden" of showing that challenged conduct will not recur. *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Voluntary cessation is of special interest when circumstances involve private entities, who normally are free to change course and revert to earlier misconduct with relative ease. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (although union had reimbursed class members for challenged fee, there was nothing to stop it from collecting similar fees in the future, and hence "[s]uch postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye"); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953) (simply stating that one will not revive a challenged practice is insufficient to moot a case, and courts should beware of such efforts, "especially when abandonment seems timed to anticipate suit"); *cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013) ("unconditional and irrevocable" agreement prohibiting defendant from returning to the contested practices sufficed to moot plaintiff's claims).

Miracle Hill's creation of a narrowly customized exception to its religiously discriminatory policy is particularly suspect here, as it seems motivated by the critical publicity that this lawsuit has focused on that policy. *See* Ex. 1 (Press Release).

That said, this case ***could*** become moot if Defendants withdrew the challenged exemptions from federal and state law that permit Miracle Hill's problematic conduct in its administration of South Carolina's foster-care program and took sufficient steps to ensure that future impermissible exemptions would not be granted once the case were dismissed. That is because Defendants, as governmental officials and entities, could change the law—actually, restore the law—and thereby bar Miracle Hill's ability to "return to [its] old ways" (*W.T. Grant Co.*, 345 U.S. at 632), whether in the form of excluding Catholics like Mrs. Maddonna formally, as before, or functionally, as under the changed policy. To be sure, Defendants would still bear a "heavy burden" (*Wall*, 741

F.3d at 497) of showing that their unconstitutional behavior will not recur.[4] In other words, Defendants would have to ensure that whatever policy changes they may enact (or revert to) were sufficiently permanent and not dissolvable with the stroke of a pen. *See, e.g.*, *Porter*, 852 F.3d at 365 (a governmental entity does not moot a case, notwithstanding a change in policy, if it retains the authority to "reassess . . . at any time") (internal quotations omitted). Simply put, were Defendants to withdraw the exemptions and administer the programs that they fund, as the Constitution requires, including by ensuring that governmental services be provided to all applicants without first meeting a religious test, Mrs. Maddonna's claims could be mooted or resolved.

*         *         *

In short, Miracle Hill's policy change neither moots nor even alters Mrs. Maddonna's claims. Instead, the policy not only continues as an impermissible denominational preference in a governmental program but also brings into even sharper relief the impermissible religious coercion in the requirement that all prospective volunteers and foster parents must affirm Miracle Hill's Doctrinal Statement. The Court should therefore deny the motions to dismiss and allow the case to proceed in the normal course.

Greenville, South Carolina
    August 20, 2019

 /s/ Aaron J. Kozloski_____
      Aaron J. Kozloski (D.S.C. Bar No. 9510)

CAPITOL COUNSEL, LLC
P.O. Box 1996
Lexington, SC 29071-1996
Tel: (803) 465-1400
Fax: (888) 513-6021
*aaron@capitolcounsel.us*

---

[4]   The Fourth Circuit holds governmental defendants to the same exacting standard as it does private defendants in evaluating whether challenged conduct is likely to recur. *Wall*, 741 F.3d at 497–98.

Richard B. Katskee*
Kenneth D. Upton, Jr. **
Carmen N. Green*
Sarah R. Goetz*
AMERICANS UNITED FOR SEPARATION OF CHURCH
    AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234
Fax: (202) 466-3353
*katskee@au.org*
*upton@au.org*
*green@au.org*
*goetz@au.org*

*Counsel for Plaintiff Aimee Maddonna*

\*     Admitted *pro hac vice*.

\*\*   Licensed in Oklahoma and Texas only.
     Supervised by Richard B. Katskee, a
     member of the D.C. Bar. Admitted *pro hac*
     *vice*.