# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### SPARTANBURG DIVISION

| | |
|---|---|
| Aimee Maddonna,<br>　　　　　　Plaintiff,<br><br>　　v.<br><br>United States Department of Health and Human Services; Alex Azar, *in his official Capacity as Secretary of the United States Department of Health and Human Services*; Administration for Children and Families, *Department of Health and Human Services*; Steven Wagner, *in his official Capacity as Principal Deputy Assistant Secretary for the Administration for Children and Families*; Henry McMaster, *in his official capacity as Governor of the State of South Carolina*; and Michael Leach, *in his official capacity as Acting State Director of the South Carolina Department of Social Services*,<br><br>　　　　　　Defendants. | Civil Action No.: 6:19-cv-448-TMC<br><br><br><br><br><br><br><br><br><br>**ORDER** |

Plaintiff Aimee Maddonna filed this suit alleging various constitutional violations based on her inability to volunteer with foster children and serve as a foster parent through a non-governmental child-placement agency, Miracle Hill Ministries ("Miracle Hill"), because of her Catholic faith.[1] (ECF No. 1). Plaintiff contends that Miracle Hill receives government funding and, therefore, should not be able to discriminate and deny her the ability to volunteer or foster with its programs based on her religious beliefs. *Id.* Pertinent to this action, Plaintiff alleges that

---

[1] The court notes that Miracle Hill is not a party to this action.

Defendant Henry McMaster ("McMaster") and Defendant Michael Leach ("Leach")[2] (collectively the "State Defendants") enabled, sanctioned, and failed to implement adequate safeguards against such discrimination by seeking a waiver from the Department of Health and Human Services ("HHS") to permit South Carolina's faith-based child-placement agencies ("CPAs") to discriminate in violation of 45 C.F.R. §§ 75.300(c) and (d), while still receiving government funding and by McMaster issuing Executive Order No. 2018-12, directing the South Carolina Department of Social Services ("DSS") to permit faith-based CPAs to associate "only with 'foster parents and homes who share the same faith' as the subgrantee 'in recruiting, training, and retaining foster parents'" and to not deny licensure to faith-based CPAs on such basis. *Id.* at 18–19. Plaintiff further contends that Defendants HHS, Alex Azar ("Azar"), the Administration for Children and Families, and Steven Wagner ("Wagner") (collectively the "Federal Defendants") have enabled, sanctioned, and failed to provide adequate safeguards against such discrimination by granting the South Carolina Foster Care Program an exemption from the religious anti-discrimination component of 45 C.F.R. § 75.300(c). *Id.* at 19.

This matter is before the court on various motions to dismiss. (ECF Nos. 12, 18, 29). The State Defendants filed separate motions to dismiss.[3] (ECF Nos. 12, 18). Plaintiff filed a joint response in opposition to both motions, (ECF No. 20), and the State Defendants filed separate replies[4] (ECF

---

[2] When the complaint was filed, Joan Meacham was serving as Acting State Director of the South Carolina Department of Social Services. On August 22, 2019, the parties consented to substituting Defendant Michael Leach for Joan Meacham, as he had succeeded Ms. Meacham as Acting State Director of the South Carolina Department of Social Services on April 18, 2019. (ECF No. 58). Pursuant to Fed. R. Civ. P. 25(d), the court granted the motion. (ECF No. 61).

[3] Leach indicates that he should be dismissed from the case for the same reasons as stated in McMaster's motion and that he "incorporates by reference" McMaster's motion to dismiss (ECF No. 12) and its attachment (ECF No. 12-1). (ECF No. 18).

[4] In Leach's reply, he relies upon McMaster's reply and incorporates it by reference. (ECF No. 34).

Nos. 33, 34). The Federal Defendants filed a joint motion to dismiss. (ECF No. 29). Plaintiff filed

a response (ECF No. 39), and the Federal Defendants replied (ECF No. 42). These motions to

dismiss are now ripe for review.

## I.    BACKGROUND AND PROCEDURAL HISTORY[5]

South Carolina has faced an increasing need for foster homes over the past five years, and

South Carolina has been unable to meet the demand, leaving over a thousand children without

home placement. *See, e.g.,* (ECF Nos. 1 at 20–21; 12-1 at 7; 29-1 at 7). In an attempt to meet these

growing needs, DSS contracts with private CPAs, who receive licenses from the state "to facilitate

the placement of foster children with foster parents and families by providing counseling, referrals,

searches, and other services." (ECF No. 1 at 11). Pursuant to Title IV-E of the Social Security Act,

South Carolina receives reimbursement from HHS for a portion of the state's foster care

expenditures, which the state then uses to partially reimburse the CPAs for their services. (ECF

No. 1 at 12); *see also* S.C. Code Ann. § 63-9-30(5); S.C. Code Regs. § 114-4910.

DSS typically issues one-year licenses to CPAs that meet all regulatory and DSS

requirements. (ECF No. 1 at 11) (citing S.C. Code Ann. § 114-4930(E)). DSS then monitors those

CPAs to ensure that they continue to comply with federal and state law requirements. *Id.* (citing

S.C. Code Ann. § 114-4920(E)). If a CPA is temporarily unable to comply with a state foster-care

regulation, DSS may grant the agency a temporary license "if the agency provides a written plan

to the Department to correct its areas of noncompliance within a probationary period." *Id.* (citing

S.C. Code Ann. § 114-4930(F)).

---

[5] These facts are taken from Plaintiff's Complaint, as the court must accept Plaintiff's factual allegations as true for purposes of motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court, however, is "not bound to accept as true a legal conclusion couched as a faction allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor must the court "accept as true unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts. Inc. v. J.D. Assocs., LLP*, 213 F.3d 175, 180 (4th Cir. 2000).

In December 2015, HHS began requiring, as a part of its contracts with the state foster care systems, "that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion . . . ." (ECF No. 1 at 13). HHS also required contractors to "agree to comply with this policy in supporting the program" and required contractors to include the anti-discrimination clause in any subcontract. *Id.* In July 2016, HHS proposed changes to 45 C.F.R. § 75.300 to codify that anti-discrimination provision, and the changes became effective on January 11, 2017. *Id.* at 13. Pursuant to 45 C.F.R. § 75.101(b)(1), the anti-discrimination provisions of 45 C.F.R. § 75.300 apply to South Carolina's CPAs just as they apply to DSS. *Id.*

Miracle Hill is one of the CPAs[6] in Greenville, South Carolina, and it serves the counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens, and Spartanburg. *Id.* at 7. Miracle Hill is a faith-based ministry, and it is the largest CPA in both the state and the upstate South Carolina region. *Id.* at 21. As a CPA, Miracle Hill is charged with conducting a variety of services on behalf of the state, including, but not limited to (1) conducting initial and relicensing foster-home investigations; (2) making recommendations to DSS regarding foster-home licensing; (3) monitoring homes for compliance with DSS regulations; (4) investigating complaints of regulatory violations; (5) developing written case plans for all children assigned to them; and (6) determining which foster home is appropriate for a child's placement based on the agency's assessments of foster families' and children's needs and strengths. *Id.* at 12.

---

[6] Plaintiff contends that Miracle Hill is one of only three non-governmental CPAs in Greenville County, South Carolina. (ECF No. 1 at 8). However, McMaster points out in his motion that there are at least nine other non-governmental CPAs serving Greenville County. (ECF No. 12-1 at 9). Nonetheless, McMaster acknowledges that the court must accept Plaintiff's factual statement as true for this motion to dismiss. *Id.*

In reviewing Miracle Hill's 2018 application to renew its license as a CPA, DSS discovered that Miracle Hill's website mentioned "the recruitment of Christian foster parents and families" and that foster-care applicants were asked to provide information regarding their families' religious beliefs. *Id.* at 14. DSS further determined that Miracle Hill "directs its staff to inquire about families' particular religious beliefs and practices before accepting them to volunteer or to foster a child." *Id.* DSS followed up with Miracle Hill to determine what the purpose was of such inquiries and confirmed that Miracle Hill uses the religious information "to refuse to provide services as a licensed child-placement agency to families who are not practicing evangelical Christians." *Id.* at 14–15.

Accordingly, DSS determined that Miracle Hill's practices constituted discrimination on the basis of religion, in violation of several state and federal policies and regulations, and, therefore, on January 26, 2018, DSS issued Miracle Hill only a temporary CPA license under S.C. Code Reg. § 114-4930(F). *Id.* at 17. DSS notified Miracle Hill that it had thirty days to address DSS's concerns and issue a written plan of compliance. *Id.* To Plaintiff's knowledge, Miracle Hill has not issued a written plan of compliance to date. *Id.*

On February 27, 2018, McMaster, in his capacity as Governor of South Carolina, wrote a letter to Defendant Wagner, the then-Acting Secretary for the Administration of Children and Families within HHS, requesting that HHS provide South Carolina with a "waiver for faith-based entities from the HHS requirement that federal funds be withheld or returned in case of violations of federal law by state foster-care" CPAs. *Id.* at 17. Pertinent to this action, McMaster specifically identified 45 C.F.R. § 75.300(c) and (d) and suggested that he believed these regulations "effectively required faith-based foster-care child placement agencies to abandon their religious beliefs or forgo the available public licensure and funding." *Id.* at 18. After sending the letter

requesting the waiver, on March 13, 2018, McMaster issued Executive Order No. 2018-12, directing DSS to permit faith-based foster-care child-placement subgrantees to associate only with "foster parents and homes who share the same faith . . . in recruiting, training, and retaining foster parents," and ordering DSS not to deny licensure of faith-based programs based on these actions. *Id.* The Executive Order further dictated that DSS not "directly or indirectly penalize religious identity or activity in applying the state's requirements for licensure for foster care." *Id.*

On June 29, 2018, the South Carolina legislature ratified a budget proviso directing DSS to use funds appropriated by the legislature to "make and promulgate rules and regulations to protect faith-based foster-care child-placement agencies from adverse actions if those agencies 'decline any service that conflicts with, or provide any services under circumstances that conflict with, a sincerely-held religious belief or moral conviction of the' agency." *Id.* 19 (citing 2018 S.C. Acts 3651, § 38.30).

On January 23, 2019, HHS granted the South Carolina Foster Care Program an exemption from the antidiscrimination requirement of 45 C.F.R. § 75.300(c). *Id.* at 20.  In granting the exemption, Defendant Wagner stated that the South Carolina Foster Care Program subgrantees, like Miracle Hill, could use "religious criteria in selecting among prospective foster parents." *Id.*

As it pertains to this case, Plaintiff and her husband and three children desired to volunteer with foster children through Miracle Hill Ministries, in hopes that the family may eventually be "willing and prepared to provide a foster home to a needy child who was an appropriate fit with the family." *Id.* at 7.  At some unspecified point in time, Plaintiff reached out to Miracle Hill to inquire about volunteer opportunities and "provided answers about her experience with the foster-care system and her family's ability to volunteer." *Id.* at 9. However, according to Plaintiff, when the representative from Miracle Hill learned that Plaintiff and her family were of the Catholic faith,

she was told that "only Christians who attended the right type of Protestant church were permitted to volunteer with and work with the children" in Miracle Hill's care. *Id.* Plaintiff states that because of her experience with Miracle Hill, she "has been afraid to reach out to the other nongovernmental foster-care child-placement agencies." *Id.* at 10. Plaintiff apparently reached out to Miracle Hill again in February 2019, asking "that her family be accepted as volunteers." (ECF No. 1 at 11). However, Plaintiff's complaint is silent as to the outcome of such inquiry.[7] Furthermore, Plaintiff does not allege that she sought opportunities to volunteer or foster children through any other agency.

Plaintiff alleges that her inability to become a volunteer or foster parent through Miracle Hill was directly caused by the actions of the State Defendants and Federal Defendants because they have affirmatively enabled the discrimination against the Maddonnas by licensing and funding Miracle Hill. *Id.* at 10. Additionally, Plaintiff contends that Defendants have failed to consider the best interests of the children and have "den[ied] these children access to safe and loving homes," *id.* at 19, thereby "worsening South Carolina's foster-care crisis," *id.* at 23.

In her Complaint, Plaintiff asserts the following causes of action: (1) that the Federal Defendants' granting of the exemption was arbitrary, capricious, an abuse of discretion, and contrary to the law under 5 U.S.C. § 706(2)(A); (2) that the Federal Defendants' granting the exemption violated the Establishment Clause of the First Amendment and the equal protection guarantee and substantive due process protections of the Fifth Amendment of the Constitution, and, therefore, is contrary to constitutional rights, powers, privileges and immunities, in violation of 5 U.S.C. § 706(2)(B); (3) that all Defendants have violated the Establishment Clause of the First Amendment; (4) that the Federal Defendants violated the Due Process Clause of the Fifth

---

[7] In fact, Plaintiff's complaint was filed within a week of her reaching out to Miracle Hill regarding any potential volunteer opportunities.

Amendment; (5) that the Federal Defendants have violated the Substantive Due Process Clause of the Fifth Amendment; (6) that the State Defendants violated the Equal Protection clause of the Fourteenth Amendment; and (7) that the State Defendants have violated the Substantive Due Process Clause of the Fourteenth Amendment. *Id*. at 23–32.

As to these claims, Plaintiff seeks for this court to (1) declare the exemption from 45 C.F.R. § 75.300(c) to be in violation of the First and Fifth Amendments of the Constitution and the Administrative Procedures Act; (2) declare the South Carolina Executive Order No. 2019-12 to be in violation of the First and Fourteenth Amendments of the U.S. Constitution; (3) declare that the Federal Defendants have violated and continue to violate the First and Fifth Amendments of the Constitution by providing federal tax dollars to faith-based CPAs that use religious criteria in placement; (4) declare that the State Defendants have violated and continue to violate the First and Fourteenth Amendments to the Constitution by providing taxpayer funds to faith-based CPAs that use discriminatory criteria in performance of government services; (5) enter a permanent injunction prohibiting all Defendants from implementing the exemption to 45 C.F.R. § 75.300(c); (6) enter a permanent injunction prohibiting State Defendants from implementing or relying on South Carolina Executive Order 2018-12; (7) enjoin all Defendants from expending tax dollars on faith-based CPAs that use discriminatory religious criteria to perform contracted-for government services; and (8) award such further and additional relief as the court deems just and proper. *Id.* at 32–34.

The State Defendants have filed motions to dismiss, arguing that Plaintiff lacks standing to assert her claims and that she has failed to allege sufficient facts to constitute cognizable causes of action. (ECF Nos. 12, 18). Specifically, as to standing, the State Defendants assert that Plaintiff has not alleged a cognizable injury; that any injury she suffered is a result of the conduct of Miracle

Hill and/or Plaintiff and is, therefore, not fairly traceable to State Defendants; and that Plaintiff's alleged injuries would not be redressed by the relief she seeks. (ECF No. 12 at 9–15). Furthermore, State Defendants allege that to the extent Plaintiff asserts taxpayer standing as to her Establishment Clause claim, such argument fails because the Executive Order was a "discretionary action of [an] executive official[]," and, therefore, not a legislative appropriation that can be challenged via taxpayer standing. *Id.* at 16–19. As to the merits of Plaintiffs' claims, State Defendants argue that such claims should be dismissed because Plaintiff has "failed plausibly to allege interference with a fundamental right" in the face of "numerous legitimate government purposes" for State Defendants' actions, *id.* at 21–23; that State Defendants' actions did not discriminate among religions, *id.* at 25; that these sorts of actions have been "historically permissible," *id.* at 27–29; and that the government's "accommodation of faith-based child welfare providers is not only permitted by the First Amendment, it is required by decades of Supreme Court precedent, state and federal law, and the First Amendment itself," *id.* at 34. Plaintiff responded to these motions to dismiss (ECF No. 39), and State Defendants filed replies (ECF No. 42, 43).

Federal Defendants filed a separate motion to dismiss, also asserting that Plaintiff lacks standing to bring her claims against Federal Defendants because Plaintiff cannot show that her alleged injuries are traceable to them or that the relief she seeks will redress her alleged injuries. (ECF No. 29-1 at 15–21). Federal Defendants also assert that Plaintiff lacks taxpayer standing because "she has not identified any act of Congress that appropriates funds specifically for faith-based organizations under the Title IV-E program," and no act of Congress "expressly contemplates, let alone requires, the involvement of faith-based organizations in the program." *Id.* at 21–23. Additionally, Federal Defendants contend that the court lacks jurisdiction to hear Plaintiff's APA claims because HHS's exemption is "the type of non-enforcement decision that is

'presumed immune' from judicial review under the APA." *Id.* at 25 (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)). Finally, Federal Defendants assert that Plaintiff has failed to raise cognizable constitutional claims because Plaintiff has failed to establish a state action for which Federal Defendants can be held responsible; the exemption was driven by a secular purpose with the primary effect of neither advancing nor inhibiting religion and did not excessively entangle church and state; the exemption was not fatally arbitrary; and the exemption is rationally related to legitimate government interests. *Id.* at 28–39. Plaintiff responded to the motion (ECF No. 39), and Federal Defendants replied (ECF No. 42).

On July 17, 2019, Defendant McMaster filed a supplement to his motion to dismiss, stating that it had come to his attention that Miracle Hill had changed its policies and now allows persons of the Catholic faith to serve as both foster parents and employees. (ECF No. 46). On August 6, 2019, the court ordered all parties to file a brief specifying how this development affected the case, if at all. (ECF No. 50). All parties filed responsive briefs indicating that they did not believe the new policy affected the case as it stood. (ECF Nos. 51, 52, 53, 54). The motions to dismiss are now ripe for review.

## II.    LEGAL STANDARD

Article III of the Constitution restricts federal courts' jurisdiction to the adjudication of cases and controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). One element of the case-or-controversy requirement is that the Plaintiff must have standing to sue, or, in other words, that Plaintiff is the proper party to bring suit. *See id.* The standing doctrine upholds this restriction by "ensur[ing] that a plaintiff has a personal stake in the outcome of a dispute, and that judicial resolution of the dispute is appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 287, 396 (4th Cir. 2011) ("*Gaston II*"). Thus, "[t]o meet the constitutional

requirement for standing, a plaintiff must prove that: 1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision." *Id.* Such alleged injury must be particularized to that Plaintiff, and courts have consistently held that "a plaintiff raising only a generally available grievance about government - claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large - does not have an Article III case or controversy." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573–74 (1992). Additionally, to be "fairly traceable" to the defendant, there must be a "causal connection between the injury and the conduct complained of" and the injury must not be the result of "the independent action of some third party not before the court." *Id.* at 561. Furthermore, the Plaintiff must show more than mere conjecture or speculation as to the redressability of her alleged injury should she prevail on the merits of her case.

The party invoking federal jurisdiction bears the burden of establishing the three elements of standing. *Id.* Because standing is not a pleading requirement but rather an "indispensable part of the plaintiff's case" that speaks directly to whether the claims establish a "case or controversy" within the parameter of federal court jurisdiction, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof" at that stage in the litigation. *Id.* Accordingly, here, the court considers Plaintiff's burden regarding standing with the same scrutiny that it would within the context of a motion to dismiss at the pleading stage.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated

in Rule 8 [of the Federal Rules of Civil Procedure] . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted)." *Id*. Rule 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard requires that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

In *Ashcroft v. Iqbal*, the United States Supreme Court stated that to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [a party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a [party] has acted unlawfully." *Id.* Rather, "[i]t requires [a party] to articulate facts, when accepted as true, that 'show' that [the party] has stated a claim entitling [them] to relief[.]" *Francis*, 588 F.3d at 193 (*quoting Twombly*, 550 U.S. at 557). Such "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - "'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III.     ANALYSIS

Before the court can address the merits of Plaintiff's Complaint to see if she has set forth cognizable claims for relief, the court must first determine if Plaintiff has standing to bring this suit. *See Raines*, 521 U.S. at 818 (recognizing that standing is jurisdictional because without standing, there is no "case-or-controversy"); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). As noted above, Plaintiff bears the burden of proving the following elements with sufficient factual allegations as would survive a motion to dismiss: (1) a particularized injury in fact; (2) traceability of that injury to the defendants; and (3) the likelihood that her injury will be redressed by a favorable decision of this court. *See Lujan,* 504 U.S. at 560–61.

In her Complaint, Plaintiff alleges the following injuries: (1) that she has had to pay federal and state tax dollars that have gone to supporting publicly funded foster-care services that are provided in a discriminatory manner and (2) that she was "denied . . . the opportunity to foster or volunteer with foster children."  (ECF No. 1 at 4). In her response to the Motion to Dismiss, Plaintiff also alleges that she has been injured by being subjected to "the stigma of discrimination" while seeking "service from or participation in" a government program. (ECF No. 20 at 18–19).

As for Plaintiff's contention that she has been injured because the government has used her federal and state tax dollars to support faith-based CPAs, the court finds that such injury is not particularized to Plaintiff and is, instead, a generalized grievance that Plaintiff does not have standing to assert in federal court. Courts have consistently held that "plaintiff[s] raising only a generally available grievance about government - claiming only harm to h[er] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more  tangibly benefits h[er] than it does the public at large - does not state an Article III case or controversy."

*Lujan*, 504 U.S. at 573–74. Plaintiff's alleged injury involving her tax dollars being used to support faith-based CPAs is separate and distinct from her alleged injury of denial of participation in the volunteer and foster-parent programs and is not particularized to Plaintiff but could apply to every other taxpaying citizen in the public at large. Therefore, the court finds Plaintiff's injury regarding her payment of tax dollars to be insufficient to establish standing.

However, Plaintiff has stated that her emphasis on her tax dollars being used to support Miracle Hill was to show a direct injury, not to support a notion of taxpayer standing. (ECF No. 20 at 23 n.5). However, to the extent Plaintiff has attempted to assert any taxpayer standing, the court finds that Plaintiff has failed to do so. As a general matter, federal taxpayers do not have standing to sue in federal court based on the allocation of their taxes. *See Commonwealth of Ma. v. Mellon*, 262 U.S. 447, 487 (1923). However, in *Flast v. Cohen*, the Supreme Court created a narrow exception to this rule, allowing taxpayers to establish standing to bring an Establishment Clause challenge, stating that the "taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Article I, § 8 of the Constitution." 392 U.S. 83, 102–03 (1968). This narrow exception applies only "when the taxpayer has established a 'logical link between his taxpayer status and the type of legislative enactment attacked' as well as a 'nexus between that status and the precise nature of the constitutional infringement alleged.'" *Hinrichs v. Speaker of the House of Reps. of the In. Gen. Assembly*, 506 F.3d 584, 598 (7th Cir. 2007) (quoting *Flast*, 392 U.S. at 102–103). Therefore, Plaintiff could only conceivably attempt to assert taxpayer standing as to her claims regarding the Establishment Clause. Even then, Plaintiff has not set forth any challenge to any *legislative* action, but has, rather, challenged discretionary executive actions and appropriations.[8] Furthermore,

---

[8] The court takes judicial notice of the fact that HHS is a cabinet-level agency within the Executive Branch of the federal government.

Plaintiff has provided no basis for any nexus between any legislative action and the actions of the Defendants. Accordingly, the court finds Plaintiff has failed to assert any basis for taxpayer standing.

Assuming without deciding that Plaintiff's other alleged injuries - *i.e.* that she was denied the opportunity to volunteer and/or become a foster parent through Miracle Hill and was discriminated against in the process - has been sufficiently alleged at least in terms of the burden of proof required at this stage, the court finds that Plaintiff has failed to establish that such injury was fairly traceable to any Defendant. Plaintiff's Complaint detailed the four-year progression of events within federal and state governments that ultimately lead to McMaster's 2018 Executive Order and HHS's 2019 exemption of which she challenges. *See* (ECF No. 1) (noting that HHS began requiring contracts with states to include non-discriminatory language as early as 2015 and describing the changes in policy both within the state and federal system leading up to the 2019 exemption). However, at no point in Plaintiff's detailed timeline regarding the changing governmental policies did she allege when she reached out to Miracle Hill seeking to become a foster parent. Finding that when Plaintiff contacted Miracle Hill impacts the issue of standing, which goes directly to the court's jurisdiction over the case, the court issued an order on November 6, 2019, instructing Plaintiff to provide the court with the month and year that she contacted Miracle Hill and was told she could not volunteer, as alleged on pages 8 and 9 of her Complaint.[9]

---

[9] Notably, Plaintiff bears the burden of establishing the elements of standing, and because her Complaint was so barren of any allegation as to *when* her alleged injuries arose, the court could have dismissed the case for lack of standing without allowing the Plaintiff to clarify the timeline because she had not alleged sufficient facts to link the actions of the defendants to her injury. *See, e.g., Lujan*, 504 U.S. at 561 (stating that the burden of proof for standing is determined by the stage in litigation). However, the court felt that such clarification was in the interest of justice to all parties, given the extensive filings and time expended on this case.

(ECF No. 65). Plaintiff responded that such allegations referred to her contact with Miracle Hill in 2014. (ECF No. 66).

For a Plaintiff to establish that her injuries are traceable to the defendant, she must show that there is a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The injury must be fairly traceable to the "challenged action of the defendant . . . not the result of independent action of some third party not before the court." *Id.* Here, Plaintiff's alleged injury is that she was denied the opportunity to volunteer with and become a foster parent through Miracle Hill and that she was discriminated against in the process. (ECF No. 1 at 4). Accordingly, for Plaintiff to satisfy this prong of the standing analysis, she must show that that denial was the result of the conduct of the defendants.

As set forth in her Complaint, HHS did not begin relying on the anti-discrimination language that is now codified in 45 C.F.R. § 75.300(c) until December 2015, which did not become effective as codified until January 2017. (ECF No. 1 at 13). Accordingly, there was no codified anti-discrimination language in 45 C.F.R. § 75.300(c) for McMaster to seek an exemption from until well after Plaintiff had already been denied the ability to volunteer with Miracle Hill. In fact, McMaster did not send his letter to HHS requesting an exemption until February 2018; Executive Order 2018-12 was not issued until March 2018; and HHS did not grant South Carolina an exemption from 45 C.F.R. § 75.300(c) until January 2019. *See id.* at 18–19. Accordingly, at the time Plaintiff was denied the ability to volunteer with or foster through Miracle Hill in 2014, the actions of which she complains had not taken place, and, therefore, cannot conceivably have caused or even contributed to Plaintiff's alleged harm. Instead, on its own volition, Miracle Hill, a private CPA, denied Plaintiff the ability to volunteer with its agency. Because Miracle Hill is not

a party to this action, such denial is an independent action by a party not before this court, and, therefore, Plaintiff has failed to establish the "fairly traceable" prong of the standing inquiry.[10]

## IV.    CONCLUSION

Accordingly, this case is **DISMISSED** *without prejudice* for lack of jurisdiction based on Plaintiff's failure to establish standing.[11]

**IT IS SO ORDERED.**[12]

s/Timothy M. Cain
United States District Judge

November 13, 2019
Anderson, South Carolina

---

[10] The court recognizes that Plaintiff asserts in her Complaint that she again reached out to Miracle Hill on February 9, 2019, asking to volunteer. (ECF No. 1 at 11). However, Plaintiff's Complaint is void of any allegation that she was denied the ability to volunteer or foster at that time. In fact, Plaintiff never asserts in her Complaint that she ever heard back from Miracle Hill regarding such inquiry. Instead, Plaintiff filed this lawsuit within a week of reaching out to Miracle Hill.

However, in response to the court's interrogatory regarding the timing of her allegations, Plaintiff also alleged additional facts regarding the February 2019 inquiry that were not included in her Complaint. (ECF No. 66-1 at 2). Plaintiff has not filed a motion to amend her Complaint to include such allegations. Accordingly, at this time, Plaintiff's Complaint remains void of allegations of sufficient facts to link the actions of the defendants to the injuries set forth *in her Complaint.* Furthermore, the court notes that Plaintiff, the master of her Complaint, is represented by counsel, and, therefore, the court is not required to liberally construe counsel's filings as motions to amend the Complaint to assert the newly-alleged facts.

[11] Because Plaintiff must establish all three prongs of the standing analysis, the court need not reach the issue of redressability of Plaintiff's alleged harms. However, the court takes judicial notice that on November 1, 2019, HHS issued a "Notice of Nonenforcement" and a "Notice of Proposed Rulemaking," which indicated that HHS will not be enforcing the provisions of 45 C.F.R. § 75.300(c) pending repromulgation of the code. *See* https://www.hhs.gov/about/news/2019/11/01/hhs-issues-proposed-rule-to-align-grants-regulation.html ; (ECF No. 64).

[12] All motions are, therefore, terminated as moot.